MISSOURI PACIFIC RAILROAD COMPANY *v.* HOOD.

4-5717 135 S. W. 2d 329

Opinion delivered December 18, 1939.

*Henry Donham* and *Richard M. Ryan,* for appellant.

*McDonald & McDonald,* for appellee.

BAKER, J. Robert Hood who will be referred to in this opinion by name, or as the appellee, or plaintiff, sued the Missouri Pacific Railroad Company and Guy A. Thompson, Trustee, called defendants or appellants, for damages alleging that he was injured while driving his truck south across railroad tracks at the intersection of Arkansas avenue in the city of Russellville on December 19, 1937. In his complaint he alleges that he stopped his truck and looked both ways for trains and started to cross the tracks and was struck by the train with such force that the truck was completely demolished, and he was seriously injured. The defendants denied the allegations of the complaint and asserted that a regular passenger train was pulling into the city of Russellville when the appellee ran his truck into the side of the rear end of the locomotive, breaking or knocking off the steps from it that lead up into the engine cab. There was also a plea of contributory negligence.

There was a recovery for the plaintiff in the sum of $500 for personal injuries and $300 damages to the truck. From the judgment entered comes this appeal.

It is argued first that there was an error by the trial court in its failure to instruct or direct a verdict for the defendants; second, there was error in the cross-examination of A. W. Dean, the engineer, in control of the engine at the time of the accident, and third, that the court erred in permitting one of the attorneys for the plaintiff to argue matters relative to the plaintiff's daughter making a support for the family, such matters not appearing in the record. The fourth ground of error is in the giving of certain instructions. The 5th, 6th, 7th, 8th, 9th, 10th, and 11th assignments of error arise out of the giving of other instructions or the refusal to give instructions requested by the appellants, and the 12th matter argued is that the verdict was excessive.

In order to dispose of the first of these assignments of error, we will undertake to set forth and discuss testimony offered by the plaintiff in the light most favorable for a recovery in his favor. We do not mean by this statement that we intend to accept blindly every matter presented by way of argument in the plaintiff's behalf or alleged facts as they are taken from evidence of the plaintiff or maybe other witnesses. There are some matters in this record that have been presented and are argued seriously that are contrary to physical facts, inconsistent with ordinary every-day experiences, and so unreasonable that they may not be accepted as true. This statement is not made in the spirit of harsh criticism, but for the reason only that there is no other method whereby all of the evidence in this case pertinent to the right of recovery may be discussed and analyzed, and the plaintiff have every advantage which the law accords to him after a verdict by the jury.

We begin with the plaintiff's testimony stating part of it and quoting other portions as may appear necessary. The plaintiff lived in Russellville all of his life. He was 50 years of age. His truck had been at a shop on the north side of the railroad only a block away from it. He had gotten into the truck, closed all the doors and windows of the cab and drove south going towards his home. He says he "drove up to the end of the tract." We assume that he meant he drove along the street until he came to the railroad tracks. He did not see a train or hear a whistle. The railroad tracks were running east and west; Arkansas avenue, the street upon which he was driving ran north and south. It was a street carrying rather heavy traffic; at that particular point highways 7 and 27 merged and crossed the railroad. For some time the railroad company had maintained gates at this railroad crossing, but these gates were not operated at night, but only during the daylight hours when traffic was evidently heaviest. The plaintiff insists that before he drove on to the railroad tracks he looked both ways, to the right and to the left, and repeats again that he did not hear any train whistle or see any lights upon the train. He then states that

after the train hit him, he did not remember much for a while. On cross-examination he identified a picture of the location of this railroad crossing stating that he "guessed" he had to cross over five tracks before he reached the main line track, that he looked, but did not see any trains. He denied that he could look down the railroad tracks to his left and see for a distance of a quarter of a mile. He also states that the gates were maintained or operated by a man in a house during the daytime. He repeats again that the cab windows were up, and he could not hear any whistle or see any lights. He knew he had to cross about five tracks before he reached the main track, but denied that he knew a train was due at about the time he reached the crossing. Again he asserted that he looked both ways, but did not see any trains and could not tell what prevented him seeing the train. He stated he could not explain why the automobile or truck ran into the cab of the engine and broke or knocked the step off. He was in the hospital several days, but did not remember giving Mr. Beattie, the claim agent, a statement. At the time he testified he stated that he had not entirely recovered his memory. While this particular witness was not very definite as to distance he could see as he approached the main line of the railroad track, the one upon which the accident occurred, we accept his estimate which we think is perhaps a reasonable one. On account of a curve in the railroad tracks one could see perhaps only 300 or 400 feet east in the direction from which the train came. It is insisted and argued by appellant that the way was clear for approximately one-quarter of a mile. It happened that several witnesses were in the vicinity and saw the accident. It was already dark, and the undisputed proof is to the effect that the train approaching Russellville from the east stopped to re-coal at a point perhaps a quarter of a mile east of the depot, maybe not more than 900 feet or a thousand feet from the depot. After leaving the coaling station it proceeded toward the depot at Russellville. It ran over two crossings, and the accident occurred on the third crossing which was, we understand, a block

east of the depot building. Mr. Hood was very positive
in his statement that he looked both ways, that he did
not hear the whistle blow, and that he did not see the
train. The proof, not only by employees operating the
train, and none of these was sued, was to the effect that
crossing signals were given by the whistle at each of the
crossings before the accident occurred, that is to say,
there were at least three crossing signals by the whistle.
The employees also say that the bell upon the engine
was operated by an automatic ringer and that this
was started before the train left the coal chute, that
it rang continuously from that point until after the
accident had happened. Every witness in the vicinity
who saw the accident or any part of it saw the approach-
ing train with the headlight burning. Mr. Hood, who
was driving alone, states that he did not see this train
until he was so close to it that there was no way to avoid
the accident although he struck it behind the engine cab
where the step was broken and knocked off, a point
which the engineer says was 45 feet back from the front
end of the train. If we assume, and we think we should,
that Mr. Hood was driving his truck upon the right-
hand side of the street as he approached the railroad
tracks at the time he struck or ran his truck into the
rear end of the locomotive, the front must have been
approximately 40 feet east of that part of the street
upon which Mr. Hood was driving. No doubt there
may be instances wherein one driving an automobile
or truck might find himself in such dangerous proximity
to the train, though exercising due care that he might
not strike the train, and be without serious fault or neg-
ligence. We recall two or three instances of this kind.
*Mo. Pac. Rd. Co.* v. *Powell et al.,* 196 Ark. 834, 120 S.
W. 2d 349.

In the case above cited the jury properly found
under the evidence that the train was suddenly shot or
projected into the passage way without lights or sig-
nals and the accident became inevitable, not by reason
of the fault of the driver of the automobile, but because
those operating the train failed to give due notice of
the approach to the point of collision.

We have tried to accept understandingly Mr. Hood's statement calling to our aid our own observations and experiences on occasions such as he has described. If the train was east of this crossing, say 900 feet, as Mr. Hood approached the track, although he was driving at a most reasonable rate of speed, he would certainly have crossed over in safety before the locomotive reached the crossing. On the other hand, if the train was so close to the crossing at the time Mr. Hood approached the main line of the railroad that he failed to see the headlight because it was somewhat higher than the cab of his truck, he could not, at the same time, had he looked, have failed to see the locomotive rolling upon this crossing Had it been possible for the locomotive of the train to approach the crossing without a sound and without a light, Mr. Hood's own headlight gave notice to him of the danger of driving into the side of the locomotive.

Mr. M. T. Vick was a witness called by the plaintiff. He witnessed the accident. He saw the headlight of the train as it came around the curve, he was within 20 or 25 feet of the crossing when the train came over it running at about 35 miles an hour. He says he did not hear the bell ringing, but he had heard the whistles blow. He testified that the gates at the crossing were not operated after 6 o'clock.

Carl Bearfield and his wife were a short distance south of the railroad crossing at the time of the accident. They had been visiting Ralph Bearfield and his wife and the four of them were together about 25 or 30 feet south of the crossing, and they heard the train approaching the crossing from the direction of Little Rock. They heard the whistle blow, and the train stopped at the chute. They saw the engine approaching with the headlight burning as the train approached the Arkansas avenue crossing, they saw the truck approaching the same crossing from the north, they heard the crash after the train passed. Carl and Ralph Bearfield left their wives, went through one of the coaches of the train to the other side where they found the truck and the plaintiff, who had been thrown out by reason of the impact of the

truck against the side of the locomotive. They say there was nothing to the east to prevent his observations and from seeing the train as it approached, that the whistle was blown so loud that they could not talk. Such was the effect of the testimony of these four disinterested bystanders, none of whom had any interest so far as this record shows in the outcome of this suit. There is not a single statement made by any one of them that is contradicted by Mr. Hood or by anyone else. Mr. Hood does not say that the whistle was not blown nor that the bell was not sounded, he does not even urge or argue that the headlight was not burning. He does say that he did not hear the whistle. We do not think the manner in which he makes this statement was intended by him as a dogmatic assertion that it was not sounded. We are more inclined to think that when he testified that the doors and windows of the cab were all closed, he was offering an excuse or reason why he did not hear any noises outside of his own vehicle. But that still does not answer the proposition of his failure to see the approaching headlight on a passenger train less than a quarter of a mile away. It might not reasonably be argued that the train covered this 800 or 900 feet, which he admits lay between the crossing and the point at which the locomotive could have been seen, in such short time as to project itself almost like a cannon shot immediately in front of him as he drove carefully upon this crossing looking both ways.

The proof is also undisputed that when the engineer, who had observed Hood's approach, became aware Hood could not or would not stop before driving into the side of the locomotive, brakes were put on in emergency and a part of the train was still on the crossing when it stopped. The speed had been so checked at the moment of the collision that the truck was not moved very far. It was suggested that, as Mr. Hood has explained, the carburetor was giving trouble and that his choke had to be operated in order that he might drive, that he may have been busy with his own motor troubles and for that reason failed to look up when he should have looked. To appellant's argument in that regard, the appellee replies

that there is no such record as this. We are compelled to agree.

Ordinary experiences and observations show conclusively that trains do not operate without the accompanying noises of grinding wheels, clanking steel and the puffing blasts of locomotives. In addition to these accompanying sounds on this occasion, we think it may be said that this record is without substantial dispute that the whistle was sounded at each of the crossings. There is, in fact, no dispute that the bell was ringing from the time the train left the coal chute until after the accident had happened. We make this statement fully cognizant of the fact that two or three of the witnesses stated that they did not hear the bell ring, but not one of these witnesses who did not hear it testified that he was giving particular attention to signals, bells or whistles. In other words, these statements differ from those positive and direct statements in other cases wherein the witnesses stated that such signals were not given, and they also stated that they were giving attention to that fact. The highest value that can be given to statements of witnesses in this case who failed to hear the signal sounds is that such testimony is evidence in itself that they were inattentive. These witnesses were perhaps more engrossed in what they saw than anything they heard.

The one thing conclusive in this case, if there were nothing else, is that every witness upon the scene or in the vicinity where the accident occurred testified the engine approached the crossing with headlight burning. The conclusion is irresistible that Mr. Hood either failed to look east, the direction from which the train came and on that account did not see the train or headlight, or that he looked and saw the headlight just as everybody else did. *St. Louis-San Francisco R. Co.* v. *McClinton,* 178 Ark. 73, 9 S. W. 2d 1060; *Gillenwater* v. *Baldwin,* 192 Ark. 447, 93 S. W. 2d 658; *Missouri Pacific Railroad Co.* v. *Brewer,* 193 Ark. 754, 102 S. W. 2d 538. In the last cited case plaintiff, Brewer, said he did not see the headlight of a locomotive driving straight toward him.

There is no doubt about the fact that Mr. Hood sustained a very severe jar or jolt, that for a time he was unconscious. He insisted that at the time he testified he did not remember anything that occurred for the next two or three days after the accident. These statements need not necessarily be deemed untrue. The facts stated are not impossible, they may be probable. If so, there is an explanation, not inconsistent, that Mr. Hood probably does not remember what occurred. If he was a man with faculties sufficiently normal to drive a truck in traffic and upon railroad crossings, he must be regarded as having seen what others saw, hearing what others heard, observing what others observed when he occupied a position relatively the same as was occupied by all the other witnesses.

Under the circumstances it could make little difference whether the statutory signals were sounded or not. The giving or failing to give a statutory signal at the time when one may observe all the conditions would not be deemed the proximate cause of an injury.

The appellee argues that in this case there was negligence in failing to maintain and operate the gates over the crossing at the time of the injury. The maintenance of the gates at the particular place was not required by any law to which our attention has been called. The placing of such gates and the operation thereof during heavy traffic was an additional precaution exercised by the railroad company, perhaps, in recognition that statutory signals such as the ringing of bells and the sounding of whistles must be regarded as the minimum requirements of law in the avoidance of injury to people at crossings where there is heavy traffic and that such gates were placed and operated in the exercise of the most thoughtful discretion which did not require the maintenance and operation of same after night-fall. Even if Mr. Hood did not know that the gates were not operated at night, it gave him no warrant or license to drive into a moving train that occupied the crossing before he reached it.

The next matter in this connection that is argued by the appellee is that the railroad or its employees were

negligent under the look-out statute. We do not think so. In this case the engineer was upon the north side of the train, the side from which Mr. Hood approached. Mr. Hood had started toward the railroad tracks at a point not more than a block away, was most likely not driving very fast. There was no evidence that he was attempting to beat the train to the crossing. The engineer says he was looking straight ahead, and he saw Hood when he approached the track, but at the time he observed him, there was nothing to indicate that he would drive into the train. As soon as it became apparent to him that Hood would not stop, he set the brakes in emergency, made the quickest stop possible, and the circumstances indicate that this statement is true. The train went only a short distance, perhaps, was barely moving at the time the truck was driven into it, at least, there was no such jerk or pull upon the truck as to turn it over, and the front end was turned only a short distance to the west. It seems highly probable that in the exercise of this judgment on the part of the engineer, damages were minimized. He not only kept a look-out, but under the evidence acted in accordance with the dictates of good judgment. That was not negligence.

The appellee also argues rightfully and very forcefully that when one is injured by the operation of a train, there arises, as a matter of law, a presumption of negligence. Presumptions must yield to facts as shown in the evidence which are reasonable, undisputed, and not contrary to ordinary experiences and understanding. Such evidence will prevail if opposed to a mere presumption arising out of the injury.

We submit that there is not a single factual statement in this record tending to show negligence in the operation of the train upon the particular occasion and the only negligence present which was the proximate cause of the injury was the failure of Mr. Hood to see what everybody else saw, to observe what was plainly observed by others, and to act as a prudent person would under the same circumstances. Such is the substantial evidence in this case and only one result can follow.

■■■■■■■■■■■

The interesting questions arising out of the alleged improper instructions must pass without comment. The court erred in not directing a verdict for the appellant.

The judgment is, therefore, reversed and the case having been fully developed is now dismissed.