MISSOURI PACIFIC RAILROAD COMPANY, THOMPSON, TRUSTEE, *v.* DENNIS, ADM'R.

4-6868                                          166 S. W. 2d 886

Opinion delivered December 21, 1942.

*Thomas B. Pryor, H. L. Ponder, Jr.,* and *H. L. Ponder,* for appellant.

*John Ferguson* and *Yingling & Yingling,* for appellee.

HOLT, J. Appellee's intestate, Isaac Dennis, was killed instantly at a railroad crossing in Garner, Arkansas, at about 1 o'clock a. m., October 5, 1941. Suit was filed by appellee to recover damages in the amount of $500, as administrator, for the benefit of the estate, and $2,500 in his own right.

The negligent acts alleged in the complaint were failure of appellants to give the statutory signals, that the train in question was operated at a high and excessive rate of speed, failure to keep proper lookout and that the train was not equipped with a proper headlight. The answer denied every material allegation in the complaint, and in addition specifically pleaded the contributory negligence of Isaac Dennis, as a complete bar to recovery. A jury returned a verdict for the estate in the amount of $75, and for $425 for appellee in his own right. From the judgment on this verdict comes this appeal.

The principal ground upon which appellants rely for reversal is that there was no substantial evidence upon which to base the jury's verdict and, therefore, that the trial court, at the conclusion of all the testimony, erred in refusing appellant's request to so instruct the jury.

30

In our opinion, appellant is correct in this contention.

Viewing the evidence in its most favorable light to appellee, as we must do, it is to the following effect: At about 1 o'clock in the morning of October 5, 1941, appellee's intestate, in company with Miss Thelma Scott, and his brother, Charlie Dennis, drove his 1929 Chevrolet sedan automobile on appellant's track on a crossing in Garner, Arkansas, when it was struck by one of appellant's troop-trains from the southwest, traveling at approximately 65 miles per hour. The crossing where the collision occurred is practically level. The automobile approached from the east side of the crossing. The railroad track southwest of the crossing is straight for more than a mile and the view was unobstructed. When appellee's intestate reached a point about fifty feet from this crossing he stopped his car and looked and listened. Appellee's witnesses testified, in effect, that the statutory signals (ringing the bell or blowing the whistle) were not given (§ 11135, Pope's Digest); and although this evidence is contradicted, we must assume that the signals were not given. There was no evidence that Isaac Dennis continued to look during the time he negotiated the distance of approximately fifty feet from the point where he stopped his car to the point of collision on the track.

Charlie Dennis, brother of Isaac Dennis, testified that before his brother attempted to cross the track he brought the car "practically to a stop." Witness looked in both directions and thinks his brother, Isaac, did likewise. He didn't see or hear the oncoming train and heard no signals. He was asked, "Did you see the headlight of the train?" and answered, "Yes, I think I saw a glimpse of it as it hit."

Thelma Scott was riding on the front seat with Isaac, at the time, and testified that Isaac stopped the car "about fifty feet from the railroad track." She was asked: "From that point, could you see up and down the railroad track?" and answered "yes, sir." She further testified that Isaac looked to the south and that she

looked in both directions and also listened. She did not see or hear the train and heard no signals. She was asked: "What was the first thing you saw or heard?" and answered, "I saw the light of the train just before it hit the car. The headlight was dim. Q. Did the train whistle at all? A. It whistled just before it hit the car. Q. After you saw the headlight, you heard the whistle blow? A. Yes, sir."

Ossie Fecher testified that at the time of the collision he was riding in his automobile in company with Cecil Price, Eugene Todd and Rat Daily from Searcy to Beebe along highway 67, and that he was "all the way from half a mile to a mile" from the crossing when the collision occurred; that he heard the "toot-toot" of the train which made him look. "Q. Had you noticed the train before this? A. Yes, sir, I noticed the train, but I paid no attention to it only that 'toot'." He had heard no whistle up to that time. We quote from his testimony. "Q. Had you heard any whistle before then? A. No, sir, I had not heard a thing. Q. What did you observe with respect to the headlight on that locomotive whether it was light or dim? A. They had lights, but it looked to me like it was dim. Q. What was the condition there at that time, Mr. Fecher, with respect to traffic or any other noise that would prevent you from hearing the whistle or the bell ring? A. Not anything at all, it was pretty still at that time in the morning. Q. Was there anything to prevent you from hearing the whistle or the bell if they had sounded 80 rods below that crossing? A. No, sir. Q. Did you hear any sound? A. No, sir." He further testified that he could see the headlight "as far as your eye would let you."

Cecil Price, who was in the car with Ossie Fecher, testified (quoting from his testimony) : "Q. What about the train, did you see? A. I saw the headlight. Q. How was that headlight with respect to being bright or dim? A. It was very dim. Q. You first saw it a very short time before the accident occurred? A. Yes, sir. Q. You judge that you, at that time, were about one-half mile from the crossing? A. Yes, sir. Q. On this side of the

crossing, going toward the crossing, that is, you were going down the railroad meeting the train and in the direction of the railroad crossing where the accident occurred? A. Yes, sir. Q. Did you, or not, hear the whistle blow or the bell sounded as the train approached that crossing? A. No, sir. Q. Was there anything in the surroundings there at the time or place that would have prevented you from hearing the whistle or bell? A. No, sir.''

Appellant's engineer, W. F. Gresham, testified that he was keeping a lookout as the train approached this crossing, and saw the automobile when the train reached a point between six and eight hundred feet from the crossing; that he saw the automobile approaching and it momentarily slowed up and eased up to the crossing. ''Q. What did you think then? A. We have that to occur so many times, where they ease up to the crossing and stop, I thought that was what he was going to do, but when he got within fifty or seventy-five feet of the crossing he just eased up there. When I saw that he was not going to stop, I sanded the track and brought the train to a quick stop. It was a good stop, and what you would call an emergency stop. Q. Was there anything else you could have done to avoid that accident? A. No, sir.'' He further testified that the statutory signals were given.

The testimony of G. S. Bullock, fireman, tended to corroborate Gresham's testimony.

These witnesses also testified that the engine headlight was tested before leaving Little Rock on the trip involved here, and was burning and in good condition. The train consisted of eleven cars of soldiers.

It is the imperative duty of the traveler, when approaching a railroad crossing, to look and listen. Whether he must also stop, depends upon the surrounding facts at the time. *Mo. Pacific Rd. Co. v. Carruthers*, 204 Ark. 419, 162 S. W. 2d 917. A railroad crossing is a place of known danger. Trains, in their operation, are confined to tracks and cannot be stopped as readily as an automobile. It was not negligence *per se* to operate the train, in ques-

tion here, at the speed at which it was traveling, under the circumstances, and no negligence on the part of appellant in this regard is disclosed by the evidence. The facts are that appellee's intestate, a young man 24 years of age, and of average intelligence, stopped his car fifty feet from the crossing in question. At this time (about 1 o'clock in the morning) there were no confusing lights or noises to disturb him or distract his attention. Had he looked at the time and after he stopped his car, and had he continued to look until he reached the crossing, he could not have failed to see the headlight of the oncoming train, which could be and was seen by appellee's witness, Fecher, when he was from "half a mile to a mile" away from the crossing in question. All witnesses admitted that the headlight was burning, and we think the testimony is conclusive that the proximate cause of this unfortunate collision which resulted in the death of appellee's intestate and damages to his car was due to his own negligence in failing to look, and that no negligence was shown on the part of the railroad company in the circumstances here, and as a matter of law appellee's intestate's negligence precludes recovery. On the evidence presented, not only could Isaac Dennis, after he stopped his car fifty feet from the crossing, have seen the headlight of the oncoming train had he looked and thus have been warned of its approach, but with the slightest attention on his part he could have heard the noise necessarily produced by the fast-moving troop-train in question during the stillness of the early morning hour.

This court, in *Chicago, R. I. & Pacific Ry. Co.* v. *Batsel*, 100 Ark. 526, 140 S. W. 726, announced the rule as to the duty of a traveler in this language: "The traveler must not only look and listen for the approach of trains before he goes upon the track, but he must continue to do this until he has passed the point of danger. *Railway Co.* v. *Cullen*, 54 Ark. 431, 16 S. W. 169; *Little Rock & Fort Smith Ry. Co.* v. *Blewett*, 65 Ark. 235, 45 S. W. 458; *St. Louis & S. F. Rd. Co.* v. *Crabtree*, 69 Ark. 134, 62 S. W. 64. Where the undisputed evidence shows that the injured person, by looking or listening,

had an opportunity to see and hear the approaching train before the time of the accident, and that his opportunity was such that he could not have failed to have seen or heard the train in time to have avoided the injury if he used ordinary care in looking and listening, then, under the law, he will be deemed to have seen and heard the train, although he should testify that he looked and listened and did not either hear or see the train. Under such circumstances, the traveler 'is deemed to have seen or heard what is plainly to be seen or heard.''

In the instant case, even though the statutory signals were not given, this was not the proximate cause of the collision and consequent damages. As we have indicated, it was Isaac Dennis' negligence in failing to look that caused his death. In the recent case of *Mo. Pacific Ry. Co.* v. *Doyle,* 203 Ark. 1111, 160 S. W. 2d 856, we said: ''We have many times held that the purpose of giving signals is to warn the traveler of the approach of a train, but when the traveler has this knowledge otherwise, warning signals cease to be factors. In *Chicago, R. I. & Pac. Ry. Co.* v. *Sullivan,* 193 Ark. 491, 101 S. W. 2d 175, this court said: 'The object of signals is to notify people of the coming of a train. Where they have that knowledge otherwise, signals cease to be factors.' . . . As was said in the case of *Bradley* v. *Missouri Pac. Rd. Co.,* 288 Fed. 484, and cited with approval by this court in *St. Louis-S. F. Ry. Co.* v. *Horn,* 168 Ark. 191, 269 S. W. 576, 'The only reasonable inference that can be drawn from their conduct is that they did not look, or, if they did and saw the train, deliberately took the chance of beating it over the crossing. If the former, they were guilty of gross negligence—if the latter, gross recklessness. If parties driving automobiles persist in gambling with death at railroad crossings, their estates should not be augmented by damages, if death wins. Care, not chance, is the requisite at railroad crossings'.'' See, also, *Mo. Pac. Railway Co.* v. *Hood,* 199 Ark. 520, 135 S. W. 2d 329.

As we have indicated, we find no evidence in this record contradicting that of the operatives of the train who testified that they maintained a proper lookout. For

the error indicated, the judgment is reversed, and since the cause seems to have been fully developed, it is dismissed.