[Civ. No. 27636. Second Dist., Div. Three. May 12, 1965.]

GLADYS L. MARQUIS et al., Plaintiffs and Appellants, v. THE ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Defendant and Respondent.

336

Simpson & Daley, Raymond C. Simpson, Robert O. Young and C. Neil Rehkop for Plaintiffs and Appellants.

John J. Balluff, Richard K. Knowlton, Matthew H. Witteman and Thomas F. Mortimer for Defendant and Respondent.

ASHBURN, J.*—Plaintiffs, husband and wife, appeal from a judgment rendered pursuant to an order directing a verdict for defendant in a personal injury action based on an accident which occurred in the State of Arkansas.[1]

The pretrial conference order says: "Both counsel advise the court that the law of comparative negligence is the law of the State of Arkansas and that each side will try the cause on the basis of the application of such law to this case." Reference seems to be to section 73-1004 of Arkansas Statutes 1947.[2]

---

*Retired Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council. .

[1]Plaintiffs had a home at Montebello, California and a cattle ranch near McNab, Arkansas.

[2]Section 73-1004: "In all suits against railroads for personal injury, property damage or death caused by the running of trains in this State, contributory negligence shall not prevent a recovery where the negligence of the person so injured, damaged or killed is of less degree than the negligence of the officers, agents, servants or employees of the railroad causing the injury, damage or death complained of; provided that where such contributory negligence is shown on the part of the person injured, damaged or killed, the amount of the recovery shall be diminished in proportion to such contributor[y] negligence."

This presents no problem, however, because the trial court did not permit the case to reach the point where comparison of negligence became possible. ■ The doctrine contemplates a finding of negligence on the part of both parties, whereupon the jury makes the comparison and apportionment of responsibility in the manner prescribed by statute (38 Am.Jur., § 233, p. 919; 35 Cal.Jur.2d, § 215, p. 737.) In this instance the trial judge ruled there was no substantial evidence of neglect on the part of defendant and based his direction of a verdict upon that ground.

Before reaching the merits of the ruling, it is necessary to dispose of certain Arkansas statutory presumptions which are discussed in the briefs.

Section 73-1001, Arkansas Statutes 1947 provides: "All railroads which are now or may be hereafter built and operated in whole or in part in this State shall be responsible for all damages to persons and property done or caused by the running of trains in this State." This has been treated locally as establishing a presumption of negligence of defendant (*St. Louis-San Francisco Ry. Co.* v. *Cole*, 181 Ark. 780 [27 S.W.2d 992]), but the United States Supreme Court, ruling upon section 2780, Georgia Civil Code, a similar statute,[3] held in *Western & A. Railroad* v. *Henderson*, 279 U.S. 639 [49 S.Ct. 445, 73 L.Ed. 884], that the attempted presumption was invalid because it had no logical relation to the mere fact of a railway accident, saying at pages 641-642: "Upon the mere fact of collision and resulting death, the statute is held to raise a presumption that defendant and its employees were negligent in each of the particulars alleged, and that every act or omission in plaintiff's specifications of negligence was the proximate cause of the death; and it makes defendant liable unless it showed due care in respect of every matter alleged against it. And, by authorizing the jury, in the absence of evidence, to find negligence in the operation of the engine and train, the court necessarily permitted the presumption to be considered and weighed as evidence against the testimony of defendant's witnesses tending affirmatively to prove such operation was not negligent in any respect.

" . . .

---

[3]Section 2780, Georgia Civil Code: "A railroad company shall be liable for any damages done to persons, stock, or other property by the running of the locomotives, or cars, or other machinery of such company, or for damage done by any person in the employment and service of such company, unless the company shall make it appear that their agents have exercised all ordinary and reasonable care and diligence, the presumption in all cases being against the company."

"Legislation declaring that proof of one fact or group of facts shall constitute prima facie evidence of an ultimate fact in issue is valid if there is a rational connection between what is proved and what is to be inferred. A prima facie presumption casts upon the person against whom it is applied the duty of going forward with his evidence on the particular point to which the presumption relates. A statute creating a presumption that is arbitrary or that operates to deny a fair opportunity to repel it violates the due process clause of the 14th Amendment. Legislative fiat may not take the place of fact in the judicial determination of issues involving life, liberty or property. *Manlay* v. *Georgia, ante,* p. 1 [279 U.S. 1 (49 S.Ct. 215, 73 L.Ed. 575)], and cases cited.

"The mere fact of collision between a railway train and a vehicle at a highway grade crossing furnishes no basis for any inference as to whether the accident was caused by negligence of the railway company or of the traveler on the highway or of both or without fault of anyone. Reasoning does not lead from the occurrence back to its cause. . . ." This was followed by holdings of the Arkansas courts (e.g., *St. Louis-San Francisco Ry. Co.* v. *Code, supra,* 181 Ark. 780 [27 S.W. 2d 992] and *Kansas City Southern Ry. Co.* v. *Shane,* 225 Ark. 80 [279 S.W.2d 284]) to the effect that the said ruling of the United States Supreme Court merely makes the statutory presumption inoperative when opposing evidence has been produced by the railroad company. To us, this seems an erroneous interpretation of the *Henderson* decision, but it also seems to represent the present State of Arkansas law upon this *adjective* matter.

■ While the preponderance of authority recognizes the rule that in negligence actions the law of the place of accident governs a suit brought in another jurisdiction as to the substantive aspects of the case, this is not true of procedural matters arising in the trial, and they are controlled by the law of the forum. (See *Hamlet* v. *Hook,* 106 Cal.App.2d 791, 794 [236 P.2d 196]; *Victor* v. *Sperry,* 163 Cal.App.2d 518, 523 [329 P.2d 728]; *Gallegos* v. *Union-Tribune Publishing Co.,* 195 Cal.App.2d 791, 797 [16 Cal.Rptr. 185]; *Intagliata* v. *Shipowners & Merchants etc. Co.,* 26 Cal.2d 365, 375 [159 P.2d 1]; Rest., Conflict of Laws, §§ 385 and 595.) The *Intagliata* case, *supra,* says at page 375: "Moreover, under accepted principles of conflict of laws the effect of contributory negligence is governed by the law under which the cause of action was acquired rather than by the law of

the forum. [Citations.]'' The Restatement of Conflict of Laws, section 595, page 710: ''(1) The law of the forum governs the proof in court of a fact alleged. (2) The law of the forum governs presumptions and inferences to be drawn from evidence.'' ▇ It follows that, though the rule of comparative negligence would have been applicable here had the case gone far enough to permit of comparison and apportionment, the procedural *presumptions* of the State of Arkansas do not apply to a California trial of an Arkansas accident. Manifestly, this is likewise true of *inferences* to be drawn from the evidence. This disposes of arguments made by counsel with respect to presumptions raised by section 73-1001, Arkansas Statutes 1947 (discussed *supra*) and section 73-1002, which relates to failure of railway operating personnel to keep a constant lookout.[4]

▇ Our task is to determine upon the basis of California adjective law, not that of Arkansas, whether the trial court overlooked a fact question when it directed a verdict. Had the point of comparing negligence been reached the Arkansas statute would have been controlling, but the procedure leading up to that and other issues is the procedure of the forum, California, and we must determine the propriety of the directed verdict under the California rule which precludes weighing of the evidence at that point. ▇ The rule is thoroughly settled. *Gish* v. *Los Angeles Ry. Corp.*, 13 Cal.2d 570, 573 [90 P.2d 792]: '' '. . . Such a motion is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom. [Citation.] Even though a court might be justified in granting a new trial it would not be justified in directing a verdict on the same evidence.

---

[4]Section 73-1002: ''It shall be the duty of all persons running trains in this State upon any railroad, to keep a constant lookout for persons and property upon the track of any and all railroads, and if any person or property shall be killed or injured by the neglect of any employee of any railroad to keep such lookout, the company owning or operating any such railroad, shall be liable and responsible to the person injured for all damages resulting from neglect to keep·such lookout. Notwithstanding the contributory negligence of the person injured, where if such lookout had been kept, the employee or employees in charge of such train of such company, could have discovered the peril of the person injured in time to have prevented the injury, by the exercise of reasonable care after the discovery of such peril, and the burden of proof shall devolve upon such railroad to establish the fact that this duty to keep such lookout has been performed.''

[Citation.] ▆ The power of a court in passing upon such motions is strictly limited. It has no power to weigh the evidence, but is bound to view it in the most favorable light in support of the verdict. ▆ The right of a court to direct a verdict is the same as the right of a court to grant a nonsuit. This can be done only when, disregarding conflicting evidence and giving plaintiffs' evidence all the value to which it is legally entitled, including every legitimate inference which may be drawn therefrom, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff if such verdict was given. [Citation.]' " See also, *Post* v. *Camino Del Properties, Inc.*, 173 Cal.App.2d 446, 452 [343 P.2d 294]; *McBride* v. *Atchison, Topeka & S.F. Ry. Co.*, 44 Cal.2d 113, 116 [279 P.2d 966].

▆ There is one Arkansas statute which, though not expressly declaring a presumption, imposes a duty upon a railroad engineer violation of which raises as a matter of general law, and in California, a presumption of negligence (*Parker* v. *Southern Pac. Co.*, 204 Cal. 609, 614 [269 P. 622]; *Merlino* v. *Southern Pac. Co.*, 132 Cal.App.2d 58, 64 [281 P.2d 583]; 42 Cal.Jur.2d, § 133, p. 120), which presumption does not disappear as in Arkansas, but must be weighed with the other evidence (*Scott* v. *Burke*, 39 Cal.2d 388, 397-398 [247 P.2d 313]; *Cooke* v. *Tsipouroqlou.* 59 Cal.2d 660-667 [31 Cal.Rptr. 60, 381 P.2d 940]). This section, 73-716, reads: "A bell of at least thirty [30] pounds weight, or a steam whistle, shall be placed on each locomotive or engine, and shall be rung or whistled at the distance of at least eighty [80] rods from the place where the said road shall cross any other road or street, and be kept ringing or whistling until it shall have crossed said road or street, under a penalty of two hundred dollars [$200.00] for every neglect, to be paid by the corporation owning the railroad, . . . and the corporation shall also be liable for all damages which shall be sustained by any person by reason of such neglect." Eighty rods is a quarter of a mile, 1,320 feet. This section requires a bell or steam whistle to be sounded from a point at least a quarter of a mile from the crossing, and that it "be kept ringing or whistling until it shall have crossed said road or street." The engineer testified that he began his signalling when about 500 feet from the intersection, less than half the statutory distance. "Q. What caused you to blow the whistle at that point? A. You are supposed to. That is a railroad rule made for us to blow; it is a National rule . . . they make us blow down there and

again for the crossing.'' Mr. Wheelus, fireman, said: ''The first whistle board is approximately one-quarter of a mile from the crossing and the regular whistle is sounded at that time and sound started again approximately 400 feet from the crossing.'' Obviously, there was no continuous whistling as required by the statute.

The engineer further said that the whistling continued from the 400 foot point until the crossing had been reached, but this is contradicted by the testimony of both plaintiffs and that of Mrs. Mozelle Brown. Mrs. Marquis said she heard a horn in the distance which sounded like a diesel truck horn to her; she heard no other sound of whistle or bell. Mr. Marquis said that when he was 400 to 500 feet south of the railroad crossing, he heard a sound which he associated with a diesel truck, a horn on a truck, but he could not tell where it came from. He heard no other sound of whistle or bell. Shortly after the accident, he told Mr. Brown that he heard a whistle, looked in his rearview mirror, and thought perhaps a truck was on the highway. Mrs. Brown and her husband were in church at the time of the accident. She testified she heard the sound of a train and a whistle, heard it distinctly, but only once. Defense witnesses insisted upon a constant blowing of the whistle after the engine reached the 400 foot point.　　The effect of this was merely the creation of a substantial conflict in the evidence, for testimony that one so placed that he normally could hear did not hear a particular signal or other sound is evidence of the fact that it was not given or made, evidence sufficient to create a substantial conflict with opposing testimony. Of course, this is equally true of the matter of hearing the particular sound more than once.

The defense testimony leaves uncertainty as to whether the whistle was blown at all at 1,320 feet or, as stated by the engineer, was started at 500 feet, which latter distance, of course, violated the statute. If 1,320 feet is correct and the train traveled 30 miles an hour, as stated, it consumed 30 seconds in reaching the crossing, and without giving any more signals (as must be assumed for the purpose of testing this order directing a verdict. see *Missouri Pac. R. Co.* v. *Dennis,* 205 Ark. 28 [166 S.W.2d 886, 887]). If the first whistling was at 500 feet (as stated by the engineer), there was not only a statutory violation, but inferentially there was also an inducement to plaintiffs to travel into a dangerous zone without appreciating the fact. *Peri* v. *L. A. Junction Ry.,* 22 Cal.2d 111, 118 [137 P.2d 441]: ''Several witnesses who were

in one of the cars, Guida's or McGuire's, approaching the crossing heard no bell or whistle. It may be inferred that if one or the other had been sounded they would have heard it. It cannot be said as a matter of law that they were not in a position to hear it. If a witness is in a position to hear the bell or whistle of the locomotive and he testifies he heard neither, such testimony is sufficient to raise a conflict with positive testimony that such warning was given. [Citations.]" To the same effect, see *Downey* v. *Sante Fe Transportation Co.*, 134 Cal.App.2d 720, 727 [286 P.2d 40]; *Henley* v. *Atchison, T. & S. F. Ry. Co.*, 166 Cal.App.2d 554, 560 [333 P.2d 388]; *Thompson* v. *Los Angeles etc. Ry. Co.*, 165 Cal. 748, 752 [134 P. 709]; 42 Cal.Jur.2d, § 139, p. 126. The court further remarked in *Peri* v. *L. A. Junction Ry., supra,* 22 Cal.2d 111, 120: "Too frequently appellate courts have ignored those fundamental principles when dealing with railroad crossing accidents, and have arbitrarily substituted their conclusions of law as to the care a man of ordinary prudence would exercise under the circumstances presented to the trier of facts."

It doubtless is true, as argued by defense counsel, that generally speaking the absence of a signal from an approaching train becomes inconsequential when its approach is seen (*Missouri Pac. R. Co.* v. *Moore,* 199 Ark. 1035 [138 S.W.2d 384, 386]), but this generality does not take care of the instant case. The sounding of the statutory warning is a minimum requirement of care (*Dragash* v. *Western Pac. R.R. Co.,* 161 Cal.App.2d 233, 241 [326 P.2d 649]), in this case a blowing of the whistle for 1,320 feet before reaching the crossing. If, as this record requires us to assume, there was but one blast of the horn, which was at a distance of 500 feet, it cannot be said that Mr. Marquis' seeing the train when 300 or 400 feet away from the crossing rendered an earlier blowing of the whistle unimportant for it is fairly inferable that had the warning been given sooner Mr. Marquis would have had enough opportunity to meet any emergency presented by the approach of the train, which opportunity was denied him by failure to give warning for the full distance prescribed by the statute. The *Peri* decision, *supra,* at page 126 says of such a situation: "It may well be inferred that the bell or whistle could have been heard by plaintiffs and Guida, if they had been sounded continuously while the train was approaching the crossing and thereafter to the time of the collision. The jury were justified in concluding that if such warning had been given the collision would have been avoided."

■ We conclude that the evidence leaves no basis for the court's ruling that there was no proof of negligence of defendant railway company.

This accident occurred at a country crossing at or near the hamlet of McNab, Arkansas. One train each way per day was operated over this line. The particular train, number 726, consisted of nine freight cars and two diesel locomotive units. It was proceeding in a general easterly direction, while the plaintiffs Marquis were going northerly on Highway 55 from their residence on their ranch, which was situated about a mile south of McNab; they were on their way to Sunday evening church at that place. The accident occurred about 7:25 p.m. on September 1, 1958. The train seems to have been about three to three and a half hours late, according to the time table introduced in evidence by defendants. The night was clear but dark, and the windows of the Marquis' car were up and the air conditioner operating. An earth embankment, large trees and other growth partially obstructed the view of the engineer and the automobile driver. The former was approaching the intersection at about 30 miles an hour, and the plaintiffs at about 35 to 40 miles, with their headlights on. About 400 feet westerly of the crossing, the engine emerged from a curve in the track, which extended northwesterly in and from a cut, the depth of which we do not know. The train headlights were on, but they were seal-beam, not the oscillating type. As the engine rounded the curve, they therefore shone in a diagonal direction, away from the crossing and into the door of Mrs. Spates' store, which was about 150 feet north of the crossing and also west of it; not until the engine was some 400 feet away from the crossing did its lights come to rest upon the crossing. The engineer saw the automobile in some danger when it was 300 feet away, and it probably was at that point he "tragedied the whistle" or "started the tragedy whistle," as Mr. Cannon, who was tending the store, expressed it; the engineer then threw the train into total emergency and was unable to stop until it had reached 160 feet beyond the point of impact.

■ Whether the speed of a train at a given crossing is negligent ordinarily presents a question of fact (*Bilton* v. *Southern Pac. Co.*, 148 Cal. 443, 447 [83 P. 440]; *Young* v. *Pacific Elec. Ry. Co.*, 208 Cal. 568, 573 [283 P. 61]). Appellants argue that the bald fact of inability to stop the train within the distance covered by its headlights spells negligence of the engineer. ■ But we think not, for the operator of

a commercial railroad, especially when traveling through sparsely settled territory, is free in the exercise of reasonable care to travel at high speeds and to assume that persons such as automobilists, though known to be approaching the tracks, will exercise reasonable care to stop or cross safely—and may so assume until some conduct of the motorist reasonably alerts the engineer to the fact that the traveler is not exercising or will not exercise ordinary care. ▮ *Thompson* v. *Los Angeles etc. Ry. Co.*, 165 Cal. 748, 755 [134 P. 709] : ''The duty of taking added precautions to avert a collision was not cast upon the motorman by the mere fact that he saw the automobile. It was essential, too, that he should have seen that it was in a position of danger. He had the right to assume that it would stop before coming to the track, and a realization of danger would arise only when it appeared, either that the automobile was being driven in ignorance or disregard of the possibility of meeting an approaching car, or that it had gotten so near the track that it could no longer be stopped. [Citations.]'' *Billig* v. *Southern Pac. Co.*, 192 Cal. 357, 363 [219 P. 992] : ''Turning from the right and duty of persons approaching upon a highway at its intersection with a suburban railroad to the right and duty of the engineer or motorman in charge of such suburban train or car in approaching such intersection, this court has held in numerous and uniform cases that such engineer and motorman has the right to presume that a person thus approaching the crossing of a suburban railway will perform the duty which the law imposes upon him under the foregoing authorities, and in the reasonable exercise of his faculties of observation and caution will not essay such crossing until the danger due to the approaching train or car has passed, and it has accordingly been held that the operator of such train or car was not bound to check the otherwise rightful speed of his train or car in approaching and passing such crossing until at least he has reason to believe that such person so approaching such crossing is not performing, or is not likely to perform, his duty in the foregoing regard.'' See also *Powell* v. *Pacific Electric Ry. Co.*, 35 Cal. 2d 40, 46 [216 P.2d 448] ; 42 Cal.Jur.2d, § 127, p. 116 ; *Kansas City Southern Ry. Co.* v. *Mickel*, 207 Ark. 872 [183 S.W.2d 45, 46] ; *Missouri Pac. R. Co.* v. *Doyle*, 203 Ark. 111 [160 S.W.2d 856, 858] ; *Missouri Pac. R. Co.* v. *Davis*, 197 Ark. 830 [125 S.W.2d 785, 788] ; *Missouri Pac. R. Co.* v. *Lemons*, 198 Ark. 1 [127 S.W.2d 120, 122].

▮ We have nothing in the evidence to indicate that the

motorman did not promptly discover plaintiffs' danger when he emerged from the cut or curve, or did not act immediately to stop his train as soon as possible. Hence, appellants' speed argument seems displaced as one of law. But that does not relieve the engineer of the onus of failing to give reasonable warning under the statute.

What of appellants' conduct? Is there a fact question here, or does the proof show them or either of them to have been negligent to such an extent that there was no problem for the jury to decide?

They had lived part of the time on their ranch for some three or four years, were familiar with the road and the railway crossing, but neither of them had ever seen a train upon it or heard a whistle from a train at or near that crossing. Mrs. Marquis said: "I can't remember ever hearing a whistle or a horn on that, as a train on that track." They were driving at a speed—35 to 40 miles—that cannot be held excessive as a matter of law. Asked why he did not slow down on this occasion, Mr. Marquis said: "I don't know. There wasn't another car on the street and there was nothing in sight and there were no cars parked at the store, and during the day or at times when we were driving by on weekdays there would be people around and a little activity. This time I don't recall seeing a car from the time we left home until the collision.

"Q. The road was absolutely deserted, it that true? A. I think that is true." It would seem a fair inference that in these circumstances plaintiff would easily discover the approach of a train if one there was. Plaintiffs were not bound to stop, look, and listen for approaching trains, but merely to do those acts necessary to reasonable care to discover the approach of one. Beginning with Chief Justice Angellotti's dissent in *Griffin* v. *San Pedro, L.A. & S.L. R.R. Co.*, 170 Cal. 772 at p. 778 [151 P. 282, L.R.A. 1916A 842], the stop, look, and listen doctrine has been modified to the extent expressed in *Green* v. *Key System Transit Lines*, 116 Cal.App. 2d 512, 519 [253 P.2d 780], as follows: "A fair summation of the present rule with reference to the duty of a vehicle driver approaching a railroad crossing is that he is not necessarily required to stop. He is required to look. However, he does not necessarily have to look from the best possible available spot as long as the spot selected gives him a reasonably assuring view of the track. [Citation.]

"Nor does the fact that his view down the track in the direction from which the train eventually appears, is some-

what obstructed, make him necessarily guilty of contributory negligence as a matter of law. ▮▮▮ Whether his failure to stop, the place from which he looks, and the character and extent of the obstruction, if any, are such that a reasonably prudent person would not have conducted himself as the driver did, are questions for the jury in determining whether he was guilty of contributory negligence as a matter of fact. [Citation.]'' See also *Hoffman* v. *Southern Pac. Co.*, 215 Cal. 454, 459 [11 P.2d 387]; *Anello* v. *Southern Pac. Co.*, 174 Cal.App.2d 317, 320-321 [344 P.2d 843]; 42 Cal.Jur.2d § 172, p. 169.

The statutes of Arkansas seem to confine a positive obligation of stopping and looking to a driver approaching a railroad crossing equipped with an electric warning device (section 75-637), a driver of a vehicle carrying passengers for hire, or any school bus, or one carrying explosives or inflammable liquids (section 76-638), or one approaching a grade crossing that has been designated as a hazardous crossing (section 75-640). The decisional law of Arkansas pertaining to this matter seems in accord with that of California (see *Missouri Pac. R. Co.* v. *Howard*, 204 Ark. 253 [161 S.W.2d 759, 761]; *Missouri Pac. R. Co.* v. *Dennis*, 205 Ark. 28 [166 S.W.2d 886, 888]; *Louisiana & A. Ry. Co.* v. *Ratcliffe*, 88 Ark. 524 [115 S.W. 396, 400]).

Both of the Marquises testified that they thought the one blast of the horn that they heard was that of a diesel truck. The husband said that when 400 to 500 feet from the crossing, he heard a siren. ''Q. A siren? A. Well, that maybe isn't quite a correct word. I associated it with a diesel truck, a horn on a truck. Q. In relation to your car, where did this seem to come from? A. Well, I really couldn't tell.'' He had heard train whistles on ''the Pacific''[5] near Fulton, about four miles to the south, but never at this crossing. When he heard this whistle, he checked to see if there was any truck in the vicinity and saw none. Awareness of the train first came when he was about 50 feet from the crossing. ''Q. 50 feet south of the crossing. Now, what made you aware of the train? A. Well, about the same time my wife said, 'Here is a train,' she was seated on the right side which gave her a little quicker view of it, of the crossing than I had, and I saw the train approaching about the same time she remarked that there was a train.'' He could only guess at the intervening distance, immediately applied the brakes, and the car

---

[5]This seems to be a reference to a different railroad.

stopped with about 2 feet of its length over the south rail of the tracks and the engine died. The train was at his left "slowly approaching," he attempted to start the car and back off the track; it started just seconds before it was hit. He had heard no other whistles or bells or sounds from the train.

Mrs. Marquis testified that she heard a horn in the distance that "sounded like a diesel truck horn to me." "It sounded far away and I hardly noticed it." She heard no further sound and first became aware of the train when the automobile was three or four car lengths from the track "because you couldn't even see down the track if you were very much further back." Her attention was attracted when she saw a light through the trees on her left. At first she thought it was an automobile with one lamp, but in a second or two realized that was incorrect and that it was a train, so she said to her husband-driver, " 'Oh, there comes a train.' " He made no comment but hit the brakes and the "car skidded and died on the edge of the railroad track."

 The engineer testified that "he was coming plenty fast to have been away if he hadn't stopped." If that be assumed as a proper inference, it means merely a mistake of judgment in an emergency situation. The law does not demand that one who is confronted by an emergency not caused by his own negligence must exercise "all the presence of mind and carefulness which are required of a careful and prudent man under ordinary circumstances" (*Bilton* v. *Southern Pac. Co.,* 148 Cal. 443, 450 [83 P. 440]). *Schneider* v. *Market Street Ry. Co.,* 134 Cal. 482, 490 [66 P. 734]: "In such case, the principle would apply, that 'if the plaintiff is suddenly put into peril, without having sufficient time to consider all the circumstances, he is excusable for omitting some precautions, or making an unwise choice, under this disturbing influence, although if his mind had been clear, he ought to have done otherwise. This is especially true if the peril is caused by the defendant's fault'; and of such case it is said, 'Even if, in bewilderment, he runs directly into the very danger which he fears, he is not in fault. The confusion of mind, caused by such negligence, is part of the injury inflicted by the negligent person.' [Citations.] " That the choosing of an unwise or unfortunate alternative of escape from such emergency does not spell negligence is also pointed out in *Reinders* v. *Olsen,* 60 Cal.App. 764, 772 [214 P. 268] and *Balthrop* v. *Atchison, T. & S.F. Ry. Co.,* 167 Cal.App.2d 437, 446 [334 P.2d 1041].

It cannot be said as a matter of law that this emergency was created by the negligence of plaintiff. He was not bound to appraise the whistle as one coming from a railroad engine. The very fact (which we must assume for present purposes, see *Missouri Pac. R. Co.* v. *Dennis,* 205 Ark. 28 [166 S.W.2d 886, 887]) that it was not repeated numerous times in keeping with ordinary railroad practice would tend to convince Mr. Marquis that the sound did come from a truck rather than a locomotive. He looked, saw no truck, and continued for a matter of a second or two without clearly analyzing the situation and until his wife told him of the train, whereupon he "hit the brakes." Puzzlement or mere inaction for a second or two cannot be said to constitute negligence as a matter of law. At best, Mr. Marquis' conduct in this emergency presented a question of fact as to negligence, an issue to be decided by the jury, not by the judge in advance of a verdict of that primary fact finder.

It is argued that Mrs. Marquis was a negligent passenger and hence entitled to no recovery. Concededly, her husband's negligence, if any, was not imputable to her as she was a mere passenger in a car belonging to him. The facts above delineated do not afford a basis for a holding of negligence on her part as a matter of law. It was at best a question of fact. Indeed, as soon as she realized that a train was approaching, she warned the driver and alerted him of the approaching danger, a thing she was not required to do as a matter of law (42 Cal.Jur.2d, § 149, pp. 140-141).

Whether the passenger's failure to warn the driver is negligence in a particular case presents a question of fact, not law (*Marchetti* v. *Southern Pac. Co.,* 204 Cal. 679, 682 [269 P. 529]).

We make no holding as to whether plaintiffs were entitled to a favorable verdict. We merely rule that it was reversible error to deprive them of their clear right to a jury's verdict.

Judgment reversed.

Shinn, P. J., and Kaus, J., concurred.

A petition for a rehearing was denied June 2, 1965, and respondent's petition for a hearing by the Supreme Court was denied July 7, 1965.