Mo. Pac. Rd. Co. *v.* Yarbrough.

5-1588                               315 S. W. 2d 897

Opinion delivered June 23, 1958.

*Pat Mehaffy* and *B. S. Clark,* for appellant.

*Howell, Price & Worsham* by *Max Howell,* for appellee.

Sam Robinson, Associate Justice. On the 22nd day of August, 1956, about 7:30 a. m., in Benton, at a place known as the Owosso crossing, a Missouri Pacific locomotive pulling a freight train consisting of nine cars collided with a truck being driven by appellee, Maynard C. Yarbrough. Yarbrough filed suit against the railway company and Noble Hatfield, the locomotive engisonal injuries in the sum of $20,000. The railway comneer, and obtained a judgment for damages due to perpany and Hatfield have appealed.

First, the appellants say there is no substantial evidence to support the verdict. We have reached the conclusion that the evidence was sufficient to take the case to the jury on the question of whether the locomotive engineer negligently failed to blow the whistle or ring the bell for the crossing. Several witnesses who were in a position to have heard the bell or whistle if either had been sounded testified that they heard neither a bell nor a whistle. Although such evidence is negative in character, it is admissible, and in this instance was sufficient to take the case to the jury. *Missouri Pacific R. R.* v. *Rogers,* 206 Ark. 1052, 178 S. W. 2d 667. This cause accrued at a time when Act 191 of 1955 applied. The rule of comparative negligence governs and will be controlling in a new trial. See *St. Louis Southwestern Ry.* v. *Robinson,* 228 Ark. 418, 308 S. W. 2d 282.

One of the allegations of the complaint is that the trainmen failed to keep a proper lookout. This issue was submitted to the jury. Appellants contend that the instruction on keeping a lookout was abstract, contending there is no evidence in the record to the effect that the trainmen failed to keep a proper lookout. In determining the question of whether there is any substantial evidence to support an instruction on the failure to

keep a proper lookout, the evidence must be viewed in the light most favorable to appellee.

There are four railroad tracks that cross Neeley street in Benton. At this point the street is running approximately north and south and the tracks are running east and west. There are two main line tracks and to the south of these tracks is a spur track which services the Owosso Manufacturing Company plant. To the north of the main line tracks is another switch track. The spur track going to the Owosso plant is about 50 or 60 feet south of the main line track, and from that point to the main line track it is upgrade.

On the day in question the train was traveling west at a speed of from 20 to 25 miles an hour and was to stop at the railroad depot, about a quarter of a mile west of the Owosso crossing. The appellee, Yarbrough, was traveling north on Neeley street. He was driving a truck equipped with a transmission having four speeds forward and one reverse. One of the forward speeds is known as "double low". Appellee's truck was empty. He testified that he was going after gas, and when he reached a point where his rear wheels were on the north rail of the spur track south of the main line, he came to a complete stop, looked to his right, then to his left, then to his right again, and seeing no train he put his truck in double low and started to cross the main line track at about 5 miles an hour. He testified that in looking east, to his right, the sun was in his eyes; and he also said that in that direction there was a little railroad tool house that might have interfered with his vision. From the pictures introduced in evidence, it appears that the right front end of his truck collided with the train.

According to the undisputed testimony, when about 100 feet from the crossing the fireman saw appellee's truck going up the incline to the main line track; it occurred to him that the truck driver was not going to stop; he jumped up to make sure that the engineer heard him, and hollered "Big Ho", which is the term used as a warning to apply the emergency brakes, that there is danger; the engineer immediately applied the brakes,

but, although the brakes on the train were working properly, a train of the character involved, going at a speed of from 20 to 25 miles an hour, could not be stopped in less than about 350 feet.

Appellee contends that the testimony of Richard Dick, the fireman on the locomotive, shows that the track is straight for a quarter of a mile east of the Owosso crossing, and that pictures admitted in evidence show the track to be straight for a considerable distance, and hence the fireman should have seen Yarbrough sooner than he testified he did see him, and if he had seen Yarbrough sooner the train could have been stopped before reaching the crossing. We do not find any evidence in the record that is fairly open to that construction. The pictures introduced in evidence clearly show that the crossing itself is actually in a curve, that the track is curving as it comes into the crossing and is curving east of there to such an extent that there is no indication that the fireman could see Yarbrough before he says he did see him. Appellee contends that the following testimony given on cross-examination by the fireman, Dick, indicates that the main line track is straight for a considerable distance east of the crossing:

"Q. And you are telling the jury that you do not know how far east it is where the line makes a turn from south to west?

A. I don't know the exact distance.

Q. Do you have any idea? Can you estimate it for us?

A. I could estimate it, but that would be—

Q. All right, estimate it for us, if you will.

A. My estimation, it would be somewhere close to a quarter of a mile."

When this evidence is considered along with the pictures and the other evidence in the case, it is clear that the fireman meant that the curve started about a quarter of a mile east of the Owosso crossing.

We have carefully examined the record in this case and find no direct or circumstantial evidence from which an inference could be drawn that the trainmen failed to keep a lookout or that such alleged failure in any way contributed to cause the collision. And furthermore, even assuming that the trainmen were not keeping a lookout, according to the undisputed evidence such failure could have in no way contributed to cause the collision. According to appellee Yarbrough's testimony, he brought his truck to a complete stop between the spur track and the main line; he then put the truck in double low and started across the track at about 5 miles an hour. When he did this he could not have been over about 40 feet from the main line. At 5 miles an hour he was traveling about 7 feet per second. The train was traveling between 20 and 25 miles an hour. Assuming that it was going 25 miles an hour it would not have been going over 37 feet a second. At 5 miles an hour it would take the truck about 7 seconds to reach the main line track. In this same length of time the train would travel approximately 250 feet. According to the undisputed testimony the train could not be stopped within that distance, and it would go about 140 feet before the brakes would start slackening the speed of the train to any extent. Therefore, a failure to keep a lookout could not have contributed to cause the collision. It was impossible to stop the train before reaching the crossing after the appellee put his truck in motion and started across the track. Certainly if the trainmen saw the appellee with his truck standing still near the track they would not be required to anticipate that he was going to start the truck up and attempt to cross, when to do so would make a collision almost inevitable. In *Missouri Pacific R. R.* v. *Doyle,* 203 Ark. 1111, 160 S. W. 2d 856, the court quoted from *Blytheville, L. & A. So. Ry.* v. *Gessell,* 158 Ark. 569, 250 S. W. 881, as follows: " 'The operatives of trains have the right to assume that a traveler or a pedestrian approaching a railroad track will act in response to the dictates of ordinary prudence and the instinct of self-preservation, and will,

in fact, stop before placing himself in peril, and the duty of the railroad employees to take precautions begins only when it becomes apparent that the traveler at a crossing will not do so.' ''

Appellee further contends that appellants are in no position to complain of the court's action in giving an instruction submitting to the jury the question of whether the trainmen kept a lookout, because the instruction was given at the request of appellants. It appears that appellants, by their instruction No. 3 requested the court to instruct the jury not to consider the allegation of failure to keep a lookout. The court refused to give this instruction. Among appellants' instructions was No. 19, dealing with the lookout question. In reading through the instructions requested by both sides, the trial court decided to give this instruction instead of giving appellee's instruction on that point. The court's action in giving the instruction was over the objection of appellants. It appears that the court had decided on the instructions that would be given when the attorney for appellants dictated his motion for a directed verdict and at the same time objected to the court's action in giving the instruction on the issue of keeping a lookout.

Appellants also maintain that the court erred in not submitting the case to the jury in accordance with the comparative negligence statute (Act 191 of 1955), but from what has been said heretofore this point is not likely to arise at a new trial.

Because of the error in submitting to the jury the issue of whether the trainmen kept a proper lookout, the judgment is reversed and the cause remanded for a new trial.

McFADDIN, J., not participating; MILLWEE, J., dissents.