KANSAS CITY SOUTHERN RY. CO. *v.* BAKER.

5-2383  346 S. W. 2d 215

Opinion delivered May 15, 1961.

*Hardin, Barton & Hardin,* for appellant.
*Shaver, Tackett & Jones,* for appellee.

SAM ROBINSON, Associate Justice. Appellees, Jady H. Baker, aged 40, and Grover Baker, aged 43, the surviving sons (and there are no other children) of Mrs. Ella Mae Baker, 65 years of age, who was killed at a railroad crossing at about 7:00 a.m. on the first of June, 1959, at Wilton, Arkansas, filed this suit against appellant, Kansas City Southern Railway Company, to recover for mental anguish. The complaint alleges that the operators of the train failed to give the statutory signals upon approaching the crossing and failed to keep a proper lookout, and that the railroad company had negligently parked some railway cars on a side track near the crossing which blocked Mrs. Baker's view when she approached the main line track, and as the result of such alleged acts of negligence she was struck by the train. There was a judgment for appellants in the sum of $10,000 and the railroad company has appealed.

We quote appellees' concise statement of the case: "U. S. Highway 71 lies east of and is parallel to the Kansas City Southern Railway Company tracks through the town of Wilton, Arkansas. The highway and the railway run north and south through the town and are approximately a block apart. The Alleene Road, running east and west, constitutes a street within the town of Wilton, across U. S. Highway 71 and the Kansas City Southern Railway tracks. The Wilton Post Office is located at the northeast intersection of the Alleene Road and U. S. Highway 71. The main line railway track leading from the north into the town of Wilton curves from a westerly direction to a southerly direction, a bit upgrade, three or four hundred feet north of the Alleene Road crossing. There are two side-tracks east of the main line, and the three tracks are some ten feet apart. Some empty railroad gravel cars were parked on the easternmost side-track thirty-four feet north of the street. Mrs. Ella Baker lived just west of the railway right-of-way, a short distance south of the Alleene Road.

"On the involved morning Mrs. Baker walked from her house in a southerly direction to a street crossing the railway a block south of the Alleene crossing, walked in

an easterly direction across the railway tracks and across U. S. Highway 71, thence north to the Post Office. Upon leaving the Post Office she walked in a westerly direction across U. S. Highway 71 along the Alleene Road to the railway crossing, and while in the process of walking across the railway tracks she was struck and killed by a Kansas City Southern Railway southbound freight train. Mrs. Baker had almost completed crossing the main line track when she was struck by the right front portion of the engine. The skies were cloudy and it was about to rain, while Mrs. Baker was walking to and from the Post Office.

"The locomotive engineer and fireman testified that the locomotive whistle was sounded for the crossing, and that there were emergency blasts of the whistle in an effort to warn Mrs. Baker. That testimony was corroborated by Joe Terry, seventeen years of age, who lived near the crossing, and Mrs. Louis Ross, who also lived near the crossing. Mrs. Ervin Thomas, who lived in the house closest to the crossing, at the intersection of the railway right-of-way and the Alleene Road, and Mr. Emil Griffin, who lived some two blocks from the crossing, testified that the train did not whistle for the crossing and did not sound any emergency blasts."

The engineer and fireman testified that they saw Mrs. Baker approaching the track and described her actions in doing so. The issue of whether the operators of the train kept a proper lookout was not submitted to the jury and appellees make no complaint of the trial court's action in that regard. Appellees argue that there is sufficient testimony to sustain a finding that the statutory signals were not sounded. Mrs. Thomas and Mr. Griffin, produced as witnesses by appellees, testified that although they were in a position to have heard the signals had they been sounded, they heard none. Under the decision in such cases as *Missouri Pacific R. R.* v. *Rogers,* 206 Ark. 1052, 178 S. W. 2d 667, this may have been sufficient testimony to take the case to the jury on that issue. It appears, however, that in the case of *Haney* v. *Missouri Pacific R. R.,* 214 Ark. 673, 217 S. W.

2d 610, the court deemed such negative testimony insufficient to take a crossing accident case to the jury. But it is not necessary to decide this point at this time because in the case at bar Mrs. Baker cannot recover, even though no signals were given, because if she saw the train approaching and walked in front of it, there can be no recovery regardless of whether the statutory signals were sounded. There is direct and circumstantial evidence that Mrs. Baker did see the train and tried to cross in front of it. There is no substantial evidence to the contrary. In the case of *Missouri Pacific R. R.* v. *Doyle,* 203 Ark. 1111, 160 S. W. 2d 856, this Court said: "We have many times held that the purpose of giving signals is to warn the traveler of the approach of a train, but when the traveler has this knowledge otherwise, warning signals cease to be factors."

In the case at bar the train consisted of about 135 cars and six Diesel units. The weather was threatening. It had just started to rain, or was about to start. If Mrs. Baker had waited for the train to cross in front of her, she would have been exposed to the weather for the length of time it would have taken the long train to pass in front of her. The train was bound to have been making a great deal of noise. In *Missouri Pacific R. R.* v. *Doyle, supra,* the Court said: "We must take notice, also, of the fact that a heavy freight train moving at the rate of ten to fifteen miles per hour creates a noise which, with but the slightest attention, could be heard for many city blocks." In the case at bar the train was going 40 miles per hour. Mrs. Thomas, witness for appellees, who lives about 100 feet from the railroad track, testified that although she did not hear the signals, she heard the train. She was not looking toward the railroad track but was looking in the opposite direction and saw Mrs. Baker when she passed the witness' house. Mrs. Thomas heard the train when Mrs. Baker was in front of her house, 100 feet from the tracks. The train was traveling 40 miles per hour, about ten times as fast as Mrs. Baker would be walking. This put the train about 1,000 feet or a little over three blocks away when Mrs. Thomas heard it. Mrs. Thomas testified:

"Q. At the time she [Mrs. Baker] came in front of your house, did you hear the train approaching from the north?

"A. Yes, I did.

"Q. How did you hear it?

"A. Well, I just heard it, you know, the noise of the engine.

"Q. It made a lot of noise and you could hear it coming?

"A. That's right.

"Q. From what you could hear, could you place the train—what side of the crossing it was on?

"A. No, sir.

"Q. But you know it was north of you?

"A. Yes.

"Q. And Mrs. Baker was going in front of your house at the time you heard the train coming?

"A. Yes.

"Q. What did Mrs. Baker do? Was she walking, trying to hurry?

"A. She was walking a little faster than usual."

Of course, if the train could be heard 1,000 feet away, it could be heard all the way to the crossing.

In addition to the circumstantial evidence that Mrs. Baker saw and heard the train, there is the direct testimony of both the engineer and the fireman. Mr. Carlisle J. Cranor, engineer, testified that he first saw Mrs. Baker when she was about 50 feet from the main line and "then after I got up closer she got up to the gravel spur track and as she did she looked up and started to run. That is a figure of speech, because at her age it wasn't a run, but it was faster than she was going." Mr. O. F. Parker, fireman, testified that he saw Mrs. Baker when she was 45 or 50 feet from the crossing, and that

"as the train came on down . . . she looked up and saw it." He further testified:

"Q. Just state what she did.

"A. She looked up and saw the engine, then she got in a little run or a trot. She looked like an elderly lady. She couldn't run very fast, but she got in a trot to beat the engine across the crossing, and the engineer—we both saw she was going to try to beat it, and I said 'She's going to try to beat it across'. Then he 'big holed' the train [applied the emergency brakes] . . ."

There were some railway cars parked 34 feet north of the crossing, on a side track, and appellees contend that those cars blocked Mrs. Baker's view of the approaching train. A plat of the crossing was introduced in evidence and it is shown conclusively that for at least the last 25 feet Mrs. Baker traveled before reaching the main line on which the train which struck her was traveling, there was nothing to block her view of the approaching train. All she had to do was to look to the right and she could not fail to see it. There is no indication that her eyesight was impaired, and all of the direct and circumstantial evidence goes to show that she did see it. Of course, she could have stopped in a distance of 25 feet, but undoubtedly she thought she could beat the train over the crossing. In *Missouri Pacific R. R.* v. *Doyle, supra,* Mrs. Doyle saw the headlight of the oncoming train, but thought it was standing still. As a result, she was struck by the engine at the crossing. The trial resulted in a judgment for Mrs. Doyle. In reversing the judgment and dismissing the cause this Court quoted from *Missouri Pacific R. R.* v. *Hood,* 199 Ark. 520, 135 S. W. 2d 329, as follows: "The conclusion is irresistible that Mr. Hood either failed to look east, the direction from which the train came, and on that account did not see the train or headlight, or that he looked and saw the headlight just as everybody else did."

The judgment is reversed, and since the cause appears to have been fully developed, it is dismissed.