MISSOURI PACIFIC RAILROAD CO. ET AL
v. JAMES E. ELLISON ET AL

5-5486                                465 S. W. 2d 85

Opinion delivered March 15, 1971
[Rehearing denied April 26, 1971.]

*W. J. Smith* and *B. S. Clark,* for appellants.

*Haskins & Larrison, Hardin & Rickard* and *Wright, Lindsey & Jennings,* for appellees.

J. FRED JONES, Justice. This is an appeal by the Missouri Pacific Railroad Company from a judgment against it for personal injuries and property damages growing out of a train-truck collision at a railroad crossing in Benton, Arkansas.

On March 4, 1969, James E. Ellison, while in the course of his employment by East Texas Motor Freight Lines as a truck driver, drove an East Texas truck onto the Missouri Pacific Railroad Company's track at the Neeley crossing in Benton, and it was struck by an eastbound Missouri Pacific freight train. The train stopped after the collision and Woodrow Utley, a brakeman in the employ of Missouri Pacific, injured his leg in crossing a ditch after alighting from the train.

Ellison filed suit in the Saline County Circuit Court against Missouri Pacific and its engineer, Wilson, for personal injuries. He alleged negligence in failure to keep a proper lookout and in failure to give the statutory signals. East Texas intervened for damage to its truck, tractor and trailer, and Fireman's Fund Insurance Company intervened claiming statutory subrogation rights for the amount it had paid, and would be obligated to pay, to Ellison in workmen's compensation benefits.

Missouri Pacific answered by general denial and affirmatively alleged that the plaintiff's own negligence in failure to keep a proper lookout and in proceeding onto the tracks while blinded by the sun, was the sole and proximate cause of the collision. Missouri Pacific also counterclaimed against Ellison and East Texas for damages to its locomotive and for $1,633.85, representing the amount it had paid to its brakeman, Utley, in settlement of his claim against Missouri Pacific for personal injuries under the Federal Employers Liability Act. Missouri Pacific alleged that upon receipt of Utley's

demand, it advised East Texas that Utley's claim could be settled for the amount paid and that East Texas refused to recognize its responsibility to Utley, and refused to participate in the settlement; whereupon, Missouri Pacific consummated the settlement with Utley and took a release from him in favor of itself, Ellison and East Texas.

At the trial before a jury the trial court refused to submit the counterclaim for the amount paid to Utley to the jury and dismissed the counterclaim. The cause was submitted to the jury on interrogatories and the jury apportioned the negligence 60% to Missouri Pacific and 40% to Ellison. The jury found that Ellison sustained damages in the amount of $65,000, and that East Texas had sustained property damage in the amount of $3,300. Judgment was entered for Ellison in the amount of $39,000 and for East Texas in the amount of $1,980. On appeal to this court Missouri Pacific relies on the following points for reversal:

"The defendants' motion for directed verdict should have been granted.

The court erred in refusing to give defendants' requested instruction No. 'A.'

The court erred in giving plaintiff's requested instruction No. 15.

The court erred in dismissing defendant Missouri Pacific Railroad Company's counterclaim as to Woodrow Utley."

Under its first point, Missouri Pacific argues that a verdict should have been directed in its favor for the reason that Ellison based his entire case upon the alleged fact that he failed to see the train because he was blinded by the sun, and that he was, therefore, excused from his duty to keep an effective lookout, and since he heard no train coming he proceeded across the crossing. In support of this argument, Missouri Pacific

relies heavily on *Missouri Pacific R. R. Co.* v. *Binkley,* 208 Ark. 933, 188 S. W. 2d 291. There are considerable differences in the *Binkley* case and the case at bar. In the *Binkley* case Mr. Binkley was driving his automobile up a 38 foot wet "gumbo" incline to the railroad track. The wheels were spinning on the wet "gumbo." Mrs. Binkley saw the train coming and advised Mr. Binkley. He also saw the train when it was between 70 and 100 yards away from him. He explained in detail how he continued in his attempt to drive the automobile from the track after he saw the train coming. Mr. Binkley did not testify as to how long it took him to reach the point of impact from the road at the foot of the slick incline, but as to his vision being affected by the sun, his testimony related to the time he left the road onto the incline and not as he drove onto the track.

". . . you can see as far as you can see when you leave the road. But I looked down and couldn't see it because the sun was so bright. I glanced and took a look and it was bright and I didn't see a thing. Q. Did the engineer do everything possible, do you think? A. Yes, I do. He was just like I was, he gave me time; he thought I was going to get it out of the way and when he saw I wasn't he did everything possible."

The appellee's theory in the case of *Binkley* was that the collision was due to the negligence of Missouri Pacific in maintaining a slick and muddy approach to its crossing. It was the company's contention that Binkley was guilty of contributory negligence in failing to exercise caution necessary before driving onto the railroad track. Binkley met this contention in his brief as follows:

" 'Appellant insists that the plaintiff should have seen the train before he reached the track, but anyone who has ever tried driving a car on a gumbo dump when it is wet and slick will understand that it takes all the attention and all the skill of a good driver to keep the car from skidding and going into

the ditch, and that he has no time for looking for trains or anything else.' "

The primary difference, however, between *Binkley* and the case at bar, is set out in the *Binkley* opinion in the following sentence:

"Here, appellee sued for property damage only, and any contributory negligence on his part would preclude recovery under the law at the time this action arose."

Furthermore, in the case at bar, the jury did not absolve Ellison of negligence. The jury found that he was negligent to the extent of 40% of the total negligence. The trial court properly overruled Missouri Pacific's motion for a directed verdict.

The trial court did not err in its refusal to give defendant's requested instruction No. A, which is AMI No. 1801 as modified. The trial court did give AMI No. 1801 as follows:

"There was in force in the state of Arkansas at the time of the occurrence a statute which provided: A railroad is required to place on each locomotive a bell or whistle, and these shall be rung or whistled at a distance of at least a quarter mile from where the tracks cross any public street and shall be kept ringing or whistling until the locomotive has crossed the street.

A violation of this statute although not necessarily negligence, is evidence of negligence to be considered by you along with all of the other facts and circumstances in the case."

This instruction was given in the format of AMI No. 903, as evidenced by the last paragraph of the instruction. The instruction offered by Missouri Pacific would have modified AMI No. 1801 almost beyond recognition. Missouri Pacific's requested instruction No. A is as follows:

"The purpose of giving these signals is to warn the traveler of the approach of the train. But, if the train is in plain view, or if its presence is otherwise discoverable by the exercise of ordinary care, then the giving of signals ceases to be a factor in the case.

Therefore, if you have found from a preponderance of the evidence that the train in this case was in plain view or that its presence could have been otherwise discovered by the plaintiff, James Ellison, in the exercise of ordinary care, then you are instructed that the sounding of the whistle or bell on the locomotive ceases to be a factor to be considered in this case. (Then the failure to sound the whistle and bell by the trainmen should not be considered by you as evidence of negligence.)"

This instruction would have told the jury that if the presence of the train could have been discovered by Mr. Ellison in the exercise of ordinary care, that the sounding of the whistle or bell on the locomotive ceases to be a factor to be considered in the case; and that failure to sound the whistle or the bell should not be considered as evidence of negligence.

Missouri Pacific argues that the court's refusal to give the instruction took away from the jury its duty to consider the train was in plain view, and that the presence was otherwise discoverable because some witnesses testified that they heard the noise of the train from a distance as far as a quarter of a mile away. We are unable to follow Missouri Pacific's reasoning on this point. The refusal of the requested instruction did not take from the jury its duty to consider that the train was in plain view in the light of the other instructions given by the court, including AMI No. 1804; but, on the contrary, Missouri Pacific's instruction No. A, if given as tendered, would have in effect, removed from the jury's consideration as negligence, evidence of Missouri Pacific's failure to sound the whistle or bell as required by statute, even had the engineer observed the truck approaching the crossing with all obvious

intentions of driving across in front of the train. It would appear the the physical fact that one using the crossing would be looking into the setting sun on a clear day should make it even more necessary to sound the bell and whistle on a locomotive approaching the crossing from the west in the afternoon.

Missouri Pacific relies on the case of *Kansas City Southern Ry Co.* v. *Baker,* 233 Ark. 610, 346 S. W. 2d 215, but that case is distinguished from the case at bar by two sentences in the *Baker* opinion as follows:

> "There is direct and circumstantial evidence that Mrs. Baker did see the train and tried to cross in front of it. There is no substantial evidence to the contrary."

In *Baker* we quoted with approval from *Missouri Pacific R. R.* v. *Doyle,* 203 Ark. 1111, 160 S. W. 2d 856, as follows:

> " 'We have many times held that the purpose of giving signals is to warn the traveler of the approach of a train, but when the traveler *has this knowledge otherwise,* warning signals cease to be factors.' " (Emphasis added).

As we read the *Baker* case, it does not hold that "the giving of signals ceases to be a factor because the train was in plain view and easily discoverable" as argued by Missouri Pacific in the case at bar. As above stated, in the *Baker* case, Mrs. Baker *did see* the train and simply tried to outrun it. (Apparently because rain was falling).

The Missouri Pacific contends that the trial court erred in giving plaintiff's requested instruction No. 15, which is AMI No. 1802, as follows:

> "All persons operating trains upon any railroad in this state have the duty to keep a constant lookout for persons upon, near, or approaching the railroad track. A violation of this duty is negligence.

This does not mean that each member of the train crew must keep a constant lookout, but it does mean that an efficient lookout must be kept by some member of the crew at all times."

This instruction, as given by the court, placed less duty on Missouri Pacific than would have its own requested instruction No. 3, which was refused by the court. Missouri Pacific's requested instruction No. 3 was AMI No. 1802 modified to include "property," as well as "persons" upon, near, or approaching the railroad track. Furthermore, plaintiff's instruction No. 15, as given by the court, was given in connection with plaintiff's instruction No. 20 (AMI No. 2104) which reads, in part, as follows:

"If you should find that the defendants were not guilty of negligence, which was a proximate cause of the occurrence, then they are entitled to recover the full amount of any damages you may find they have sustained which were proximately caused by any negligence of James Ellison."

Missouri Pacific, in support of its assignment of error in giving plaintiff's instruction No. 15 (AMI No. 1802), argues that engineer Wilson testified that he did see Ellison's truck when the engine was about 1400 to 1500 feet from the crossing and the truck was about 200 or 250 feet from the crossing, and that the truck was driving 20 or 25 miles per hour. But engineer Wilson also testified, as pointed out by Missouri Pacific in its brief, that when the train was within 200 or 250 feet of the crossing and it appeared that Ellison was not going to stop, he yelled at fireman Armstrong, who was operating the engine, to put it into emergency.

Fireman Armstrong also testified that he was acting as engineer at the time of the collision and that as such he sat in the righthand side of the locomotive cab and that Ellison approached the crossing from Armstrong's left side. He testified that the windshield on the locomotive extends across the front of the cab to the door channels. He testified that there is glass in the front

doors of the cab on each side of the locomotive and that he was able to see out of both sides of the cab. He testified that the engine was about 1300 to 1400 feet from the crossing when the truck-trailer came into his view. He says that Ellison was approximately 200 feet from the crossing at the time he first saw him and was traveling about 25 miles per hour after coming into his view. He testified that the truck seemed to be continuing to slow down as if it was going to stop at the crossing. He says that Mr. Wilson and Mr. Utley, as well as himself, were observing the truck very closely, and that when the truck approached the crossing to within 20 or 25 feet it looked as if the truck was going to stop, but that it didn't and "I put the brake to emergency, and, of course, *Mr. Wilson and Mr. Utley* they had *called my attention* to go to emergency *because they realized it was possible he wouldn't stop*, but he just eased down to the west rail and completed his stop and a fouling the west rail." (Emphasis added).

It was brought out on cross-examination of Mr. Wilson as well as Mr. Armstrong that in prior depositions they had estimated that the truck was approximately 600 feet from the crossing when they first observed it. The train crew testified that the usual and statutory signals were given on approaching the Neeley crossing, but other witnesses, including Ellison, testified that they heard no bell or whistle signals; so, the jury might have reasonably concluded that neither Wilson nor Utley actually saw the truck until they shouted a warning to Armstrong, and that Armstrong did not see the truck until his attention was called to it, which was too late to avoid the collision. It is obvious that the estimates of distances by Wilson and Armstrong were not very accurate. Wilson was a party defendant and his testimony is not to be regarded as undisputed. *French* v. *Browning,* 187 Ark. 996, 63 S. W. 2d 647. In the light of all the evidence, as well as all the instructions both given and requested, we conclude that the trial court did not commit reversible error in giving the lookout instruction.

We are of the opinion that the trial court did not

commit reversible error in dismissing Missouri Pacific's counterclaim as to Woodrow Utley. As we view the record there was simply no causal relation between Mr. Utley's injury and the negligence of Mr. Ellison. Mr. Wilson testified that the engine traveled about 1900 feet after the collision and that the engine stopped within about 10 feet of the Edison Avenue, or Bauxite crossing, which was the next crossing from the Neeley Street crossing where the collision occurred. Mr. Utley testified that after the collision occurred and the train had stopped he obtained the flagging equipment, as it was his duty to protect the head of the train, and that he went back to the engine to get off. He says that the front of the engine had oil all over it and was bent up so he alighted from the rear end of the engine. He says that there was a filling station at the crossing where the engine stopped and he saw the filling station attendent standing outside the station. He says that there was a little ditch between the railroad track and the filling station and that,

> "I hopped over this ditch to get the attendent to call the ambulance and police and in doing this I pulled a ligament in the calf of my right leg. He said he would call the police and ambulance and I proceeded on to the front of the train with my flagging equipment to do my flagging duties."

As to Missouri Pacific's claim against East Texas for the amount it paid to Mr. Utley in settlement of his claim against the railroad, the record shows in-chambers proceedings as follows:

> "MR. CABE: At the conclusion of the evidence the intervenor East Texas Motor Freight moves for a directed verdict on the claim of the Missouri Pacific Railroad Company seeking to recover by way of contributions for monies paid to W. W. Utley, its brakeman for the reason that the injury sustained by Mr. Utley was not proximately caused b; this collision. The chain of events had been efficiently broken and there is insufficient evidence from which a jury might find that East Texas Motor Freight

through its driver James Ellison was guilty of negligence which was a proximate cause of the injury and damages sustained by W. W. Utley.

MR. CLARK: Let the record show the Court has refused to give instructions on Mr. Utley's claim for damages on the basis that Mr. Utley had a cause of action against East Texas Motor Freight, and the action on the part of Missouri Pacific Railroad in making the settlement and including East Texas Motor Freight and James Ellison in the settlement was purely voluntary.

THE COURT: I am saying he could have a cause of action otherwise I confirm what Mr. Clark says.

MR. CABE: We object to any instructions or interrogatories regarding Mr. Utley.

THE COURT: Sustained.

MR. CLARK: Save our exceptions."

The railroad's claim for the amount it had paid its employee, Utley, was apparently made under the theory of contribution between joint tort-feasors, and although the manner in which the trial court refused to give an instruction on Utley's claim for damages is an awkward way of refusing to submit the Missouri Pacific's counterclaim on this item to the jury, we agree with the results. If there was error in the manner or reasoning of the court in reaching the results, we consider such error harmless in this case.

The fact that Utley might have had a cause of action against East Texas, and that the Missouri Pacific Railroad's settlement with Utley was purely voluntary, would not within itself justify withdrawing this part of the claim from consideration by the jury. Ark. Stat. Ann. §§ 34-1001—1009 (Repl. 1962). See also *Lacewell v. Griffin*, 214 Ark. 909, 219 S. W. 2d 227. But, proximate cause was properly defined in the instructions as, ". . . a cause which in a natural and continuous se-

quence, produces damage and without which the damage would not have occurred.''

The proximate cause of Mr. Utley's injury was obviously his ''hopping'' across a small ditch to talk to a filling station attendant at a railroad crossing some 1900 feet from the point of collision; and when the engine, from which he alighted, was within 10 feet of the Bauxite crossing he was intending to protect, and did protect, as a flagman.

The judgment is affirmed.

FOGLEMAN, J., concurs.

JOHN A. FOGLEMAN, Justice, concurring. I concur in the result. I think there was error in giving the instruction submitting the issue of the railroad's failure to comply with the lookout statute, but I do not think appellants have any standing to raise the question.

In my opinion, the undisputed evidence eliminated the lookout question entirely. The train consisted of 89 cars and 4 diesel power units. It was equipped with air braking system. At least one-half to three-fourths of a second is required for one operating the engine to perceive danger and three-fourths to one second for reaction and movement to the emergency system. Six seconds would then elapse before the lead unit develops brake cylinder pressure. The air pressure is then propagated to the rear at the rate of approximately 930 feet per second. Six or seven additional seconds will elapse before the emergency application of the brakes is effective for the entire length of this train. At least 12 seconds will elapse before there is any retardation of the train. If the train were traveling at the rate of 50 miles per hour, as the engine crew estimated, it would move at least 800 feet before there is any perceptive slowing down of the train. In the opinion of appellant's road foreman of engines, from 3,000 to 3,300 feet would be a normal stopping distance for this train traveling slightly upgrade, as it was. When the train stopped, it

blocked the crossing. The front of the train stopped at a distance of not more than 1,900 feet (34 cars and 4 power units) beyond the crossing.

The engineer in charge of the train was acting as fireman and was seated on the left-hand side of the first power unit, as was the brakeman, who sat just to his rear. This was the side from which Ellison approached in his truck. The fireman, who was acting as engineer, was seated on the right-hand side. All had many years of experience in their respective jobs. Each had an unobstructed view. Engineer Wilson (the acting fireman) testified that he saw Ellison's truck approaching on Neely Street when the train was 1,400 to 1,500 feet from the crossing. The truck was then passing the Jones warehouse. Engineer Armstrong saw it when the train was 1,300 to 1,400 feet from the crossing. Brakeman Utley estimated the distance from the crossing at the time he saw the truck at 1,500 feet. Wilson and Utley estimated the truck's speed at 20 to 25 miles per hour when they first saw it. All the engine crew testified that the truck speed constantly decreased as it approached the crossing as if it would stop before reaching the tracks. Armstrong said that the truck was moving so slowly when it was 20 to 25 feet from the crossing, it appeared that it would stop at any point. As soon as he realized that it would not, he put the brake into emergency position at about the same time that Wilson and the brakeman called out to him to do so. He saw Ellison's truck ease down to the west rail of the track on which the train was traveling and stop with the front wheels on the rail. Wilson also said the truck finally stopped on this rail before it was struck by the train. Wilson said that the front of the train was 200 to 250 feet from the crossing when it became apparent that the truck would not be stopped.

Ellison's testimony does not really contradict that of the train crew in this regard. Ellison said that he approached the tracks, stopped, and seeing nothing eased across the switch tracks toward the track on which the train was traveling without seeing or hearing anything. He said that he was traveling pretty slow in low gear

and estimated his speed at 2 or 3 miles per hour. He confirmed the fact that, when he stopped, just the front of his truck was on the rail.

The testimony of witnesses called by appellees tends to corroborate the engine crew. Warren Long was on the loading dock at Masonite about 100 yards from the crossing. He first saw Ellison approaching the crossing when his truck was about even with the Jones mill at a distance he estimated at 50 yards from the switch tracks. It seemed to him that Ellison stopped at these tracks and then proceeded after which Long heard the impact. Barnie Jernigan was standing on the back porch at Arkansas Face Veneer, about 150 yards from the crossing. He saw the truck emerge from behind a building and proceed toward the crossing and then stop suddenly about the time of the impact. When he first saw them, the truck was a little over 200 feet and the train about 150 yards from the crossing. Scotty Smith was on the dock at Masonite, at a distance of 75 to 100 yards from the crossing. He saw the truck approach the crossing and saw the front end decline when the driver applied his air brakes. As Smith turned to resume his work the truck was near the spur track. He heard the impact almost immediately.

There was every indication to everyone who saw the truck that it would stop before proceeding onto the track ahead of the train. Under similar circumstances we have held that the testimony of the train crew cannot be disregarded and that the lookout issue should not be submitted to the jury as a possible proximate cause. *Chicago, R. I. & Pac. Rd. Co.* v. *Gipson,* 246 Ark. 296, 439 S. W. 2d 931; *St. Louis-San Francisco Railway Company* v. *Spencer,* 231 Ark. 221, 328 S. W. 2d 858; *St. Louis-San Francisco Ry. Co.* v. *Cole,* 181 Ark. 780, 27 S. W. 2d 992; *St. Louis-San Francisco Ry. Co.* v. *Thurman,* 213 Ark. 840, 213 S. W. 2d 362; *St. Louis-San Francisco Ry. Co.* v. *Williams,* 180 Ark. 413, 21 S. W. 2d 611; *Kansas City Southern Railway Company* v. *Shane,* 225 Ark. 80, 279 S. W. 2d 284.

Whatever may be said about the inaccuracy of the

train crew's original estimate of the distance of the truck from the crossing, it is obvious that it would have been impossible to have stopped the train before reaching the crossing after it became apparent that the truck would proceed onto the crossing rather than stop, as it gave every indication of doing. The truck's distance from the crossing was wholly immaterial and insignificant. Under similar circumstances, we have said that failure to keep a lookout could not have contributed to cause the collision. *Missouri Pac. Ry. Co. v. Yarbrough,* 229 Ark. 308, 315 S. W. 2d 897. Language used there is pertinent:

> Certainly if the trainmen saw the appellee with his truck standing still near the track they would not be required to anticipate that he was going to start the truck up and attempt to cross, when to do so would make a collision almost inevitable. In *Missouri Pacific R. R. Co. v. Doyle,* 203 Ark. 1111, 160 S. W. 2d 856, the court quoted from *Blytheville, L. & A. So. Ry. Co. v. Gessell,* 158 Ark. 569, 250 S. W. 881, as follows [203 Ark. 1111, 160 S. W. 2d 858]: " 'The operatives of trains have the right to assume that a traveler or a pedestrian approaching a railroad track will act in response to the dictates of ordinary prudence and the instinct of self-preservation and will, in fact, stop before placing himself in peril, and the duty of the railroad employees to take precautions begins only when it becomes apparent that the traveler at a crossing will not do so.' "

In spite of the absence of an issue under the lookout statute, there was a fact issue on the question of the giving of the statutory signals. Consequently, appellant was not entitled to a directed verdict. It is in no position to complain because, as pointed out in the majority opinion, appellant requested the same instruction as that given at appellees' request. A defendant cannot complain, on appeal, of the giving of an erroneous instruction at the request of a plaintiff when it is the same, in effect, as an instruction requested by defendant. *Dunnington v. Frick Co.,* 60 Ark. 250, 30 S. W. 212. Where the evidence is sufficient to support a ver-

dict upon one of several allegations of negligence so that there was no error in failure to direct a verdict for a defendant, the defendant is in no attitude to complain of an instruction submitting an issue of negligence not justified by the evidence, when he asked an instruction submitting the same issue. *L. J. Smith Const. Co.* v. *Tate,* 151 Ark. 278, 237 S. W. 83. An alleged error in giving an instruction on·an issue not raised by the evidence is harmless where both sides request an instruction on that issue. *Keatts* v. *McAllister,* 222 Ark. 658, 262 S. W. 2d 136.

*Chicago, R. I. & P. Ry. Co.* v. *Smith,* 94 Ark. 524, 127 S. W. 715, is analogous. There the appellant contended that a pedestrian struck by its train was guilty of contributory negligence as a matter of law, so that an instruction submitting the question whether the pedestrian was guilty of negligence in failing to look, listen and discover the approach of the train was erroneous under the uncontroverted evidence. This court agreed but said:

> We think, however, that the defendant waived that particular error by requesting instruction containing the same error. By such action it invited the error. "Appellant cannot complain of an error in instructions asked by his opponent if the same error was repeated in instructions asked by himself." *Choctaw, O. & G. R. Co.* v. *Hickey,* 81 Ark. 579, 99 S. W. 839; *Railway Co.* v. *Dodd,* 59 Ark. 317, 27 S. W. 227; *St. L., I. M. & U. S. R. Co.* v. *Baker,* 67 Ark. 531, 55 S. W. 941; *L. R. & M. R. Co.* v. *Russell,* 88 Ark. 172, 113 S. W. 1021; *St. L., I. M. & S. R. Co.* v. *Carter,* 93 Ark. 589, 126 S. W. 99.

The case of *Missouri Pacific Railroad Company* v. *Yarbrough,* 229 Ark. 308, 315 S. W. 2d 897, might appear at first blush to be contra. Upon analysis, however, it appears that the trial judge had read all the requests for instructions by both parties and decided which would be given and which refused before the appellant had any opportunity to move for a directed verdict at the conclusion of all the evidence or to object to submission

of the issue of keeping a lookout, both of which appellant did. Furthermore, appellant's requested instruction no. 3, refused by the court, would have instructed the jury not to consider the allegation of failure to keep a lookout. The trial judge decided to and did give appellant's instruction request no. 19, dealing with the lookout question, instead of appellee's requested instruction on that point. Appellant *objected* to the giving of its own requested instruction on the point. Of course, under these circumstances, we found that appellant did have standing to raise the question. We have no such record here, so I would affirm the judgment.