Helen Marie SHIBLEY, Administratrix of the Estate of George Shibley, Deceased, Appellee,

v.

ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, Appellant,

The Home Insurance Company, Intervenor.

No. 75–1531.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 10, 1975.

Decided April 15, 1976.

C. Wayne Harris, J. H. Evans, Warner & Smith, Fort Smith, Ark., for appellant.

Robert L. Jones, III, Jones, Gilbreath & Jones, Fort Smith, Ark., for appellee.

Before LAY, BRIGHT and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

Appellant, St. Louis-San Francisco Railway Company, defendant below, appeals from a judgment upon a verdict of $100,-900.00 [1] for plaintiff Helen Marie Shibley,

---

1. The verdict was apportioned as follows: $900.00 to the estate of decedent George Shibley; $20,000.00 to the widow Helen Marie Shibley; $5,000.00 to each of sixteen children, eight of whom are decedent's natural children and eight of whom are his stepchildren.

Administratrix of the Estate of George Shibley, Deceased, in this wrongful death action brought in the Western District of Arkansas pursuant to the Arkansas Wrongful Death Statute.[2] Home Insurance Company, the workmen's compensation carrier for decedent, intervenes for its subrogation rights.

This litigation arose from a railroad crossing collision which occurred at approximately 1:50 a. m. on April 12, 1973 within the city limits of Fort Smith, Arkansas. Plaintiff's decedent was killed when the truck he was driving in an eastward direction across defendant's track on Spradling Avenue was struck by defendant's southbound engine, which was in a back-up movement pulling five railway cars. The train struck the truck between the cab and the trailer. The trailer was dragged some 198 feet down the west side of the track, the cab some 139 feet down the east side. The engine stopped 280 feet south of the crossing.

The evidence indicated that the decedent, who was familiar with the crossing, neither stopped nor slowed as he approached the track. To approaching motorists the only warning of the crossing was a crossbuck. One witness nearby testified that he heard no train whistle or bell. Another, a motorist, testified that he heard the train's whistle. Testimony of the train crew was that the whistle and bell were sounded as the train approached the crossing and that the train was "big holed," i. e., the emergency brake system was applied, when the train's fireman, who had seen decedent's truck approaching, realized that the decedent was not going to stop.

Among the plaintiff's allegations were that the accident was proximately caused by the defendant's negligence in operating the train at an unsafe speed, in the failure of the crew to maintain a proper lookout, in failure of the crew to sound the train's whistle or bell at the approach to the cross-

ing, and in defendant's failure to provide adequate warnings for motorists at the allegedly abnormally dangerous crossing. The court instructed the jury that it could consider whether the defendant was negligent in these respects, and the first four assignments of error relate to each of these instructions.

The defendant alleged that the collision was proximately caused by the negligence of the decedent and counterclaimed for damage to its property. And defendant appeals from the denial of its motion for a directed verdict. We affirm.

In reviewing defendant's assignments of error, we view the evidence in the light most favorable to the plaintiff. *See, e. g., Linn v. Garcia*, 531 F.2d 855 (8th Cir. No. 75–1305 1976); *Griggs v. Firestone Tire & Rubber Co.*, 513 F.2d 851 (8th Cir. 1975); *St. Louis Southwestern Ry. v. Taylor*, 258 Ark. 417, 525 S.W.2d 450 (1975).

The first assignment of error is that it was improper for the court to instruct the jury that the City of Fort Smith has an ordinance imposing a 25 miles per hour speed limit on trains operating within the city limits, and that violation of this ordinance, although not necessarily negligence, is evidence of negligence to be considered by the jury along with other facts and circumstances in the case. Defendant urges that this instruction was improper because there was no substantial evidence that the train was travelling in excess of 25 miles per hour and because there was no possibility that the speed of the train was a proximate cause of the collision.

Two witnesses testified specifically as to the speed of the train. The engineer, Curtis Ridenour, stated that the train was travelling at approximately 15 miles per hour before impact, and that even though the train had been "big holed" before impact, it had not slowed. William Steward, a motorist whose deposition was read to the

---

2. Federal jurisdiction is pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship be-

tween the parties and the amount in controversy exceeds $10,000.00

jury and who was driving behind decedent's truck at the time of the collision, first stated that he did not know the speed of the train when he first saw it, but that it "could have been going 20 or 30." Steward also testified that he himself was travelling at 35 or 40 miles per hour and that the decedent was travelling at 30 or 35, because Steward had "gained on" the decedent "a little bit." On cross examination, Steward testified that the train and the truck were travelling at about the same rate of speed. Also on cross examination it was pointed out that in a signed statement Steward had stated that the train was travelling around 25 or 30 miles per hour.

A third witness, whose testimony did not directly concern the speed of the train, provided a basis from which inferences concerning speed can be drawn. Lester Ray Hammonds, the fireman on defendant's train, testified at trial that when he first saw decedent's truck, the truck was 200 to 250 feet and that the train was about 150 feet from the crossing. However, on cross examination Hammonds was asked about his statement to the defendant's claim agent, taken on April 19, 1973, that when he first saw the truck, the truck and the train were about the same distance from the crossing. By estimating the truck's speed at 30 miles per hour, Hammonds therefore implied that the train was also travelling at 30 miles per hour.

■ From the foregoing testimony we find that there was substantial evidence from which a jury could infer that the ordinance was violated. But defendant insists that even if it can be shown that the train crew was negligent in operating the train at an excessive speed, plaintiff has failed to show that such negligence could have proximately caused the collision and that the instruction was therefore improper.

The defendant points out that Arkansas Model Jury Instruction (AMI) No. 1803, which concerns the speed of trains, contains no instruction but only a comment, which recognizes that a speed instruction is rarely given in a railroad crossing case because the negligence, if any, in a train's speeding is often difficult to establish as a proximate cause of the accident. See, e. g., St. Louis-San Francisco Ry. v. Thurman, 213 Ark. 840, 213 S.W.2d 362 (1948); Walker v. Missouri Pacific R.R., 211 Ark. 635, 201 S.W.2d 768 (1947).

There is ample authority in Arkansas holding that the speed of a train was not the proximate cause of injuries suffered by a party in a railroad crossing incident or in an accident involving a pedestrian killed or injured by a moving train. See, e. g., Harper v. Missouri Pacific R.R., 229 Ark. 348, 314 S.W.2d 696 (1958), and cases cited at 699, n. 1.

On the other hand, the Arkansas court has permitted the speed issue to go to the jury where there has been evidence of an abnormally dangerous crossing unmarked by special warnings. St. Louis Southwestern Ry. v. Jackson, 242 Ark. 858, 416 S.W.2d 273 (1967). In still another situation Arkansas permitted jury consideration of speed where there was evidence that the train was proceeding at a negligently excessive rate. There the court said in part:

. . . [I]t is fairly inferable that, if the train had been under control at a lower rate of speed the engineer, by throwing on the emergency, might have slowed down the train so that deceased could have gotten across in safety. If he had only a moment more, he would have crossed in safety, and this extra time might have been afforded by an attempt on the part of the engineer to stop the train at a lower rate of speed than that which was being maintained at the time. Davis v. Scott, 151 Ark. 34, 235 S.W. 407, 409 (1921).

See also St. Louis-San Francisco R.R. v. Call, 197 Ark. 225, 122 S.W.2d 178 (1938).

There is also Arkansas authority for permitting the jury to consider as evidence of negligence the violation of a city ordinance imposing a speed limit on trains. Missouri Pacific R.R. v. Dalby, 199 Ark. 49, 132 S.W.2d 646 (1939).

■ It seems to us that submitting a speed instruction depends upon the facts

and circumstances of the individual case. While the facts in this case indicate that neither the truck nor the train was travelling at a rapid speed, there was evidence that the train was travelling in excess of the 25 miles per hour speed limit imposed by city ordinance.[3] We note that at the time of impact the decedent's truck had almost travelled across the track and that the train, although in emergency, had not slowed its speed. Furthermore, as discussed *infra*, we have determined that there was a jury issue whether this crossing was abnormally dangerous. In these circumstances, we believe that a jury could find that unsafe speed of the train was a proximate cause of the accident and find that the court did not improperly instruct the jury on this point.

The second instruction assigned as error is based upon Ark.Stat.Ann. § 73–1002 (1957 Repl.) and is found in AMI No. 1802 and reads as follows:

All persons operating trains upon any railroad in the State of Arkansas have the duty to keep a constant lookout for persons and property upon, near or approaching the railroad track. A violation of this duty is negligence.

This does not mean that each member of the train crew must keep a constant lookout, but it does mean that an efficient lookout must be kept by some member of the crew at all times.

Defendant urges that giving this "lookout" instruction was error because there was no evidence that the crew was failing to keep a proper lookout and that uncontradicted testimony showed that the fireman, Lester Ray Hammonds, saw decedent's truck as it approached the crossing and yelled "big hole" when he realized that the truck was not going to stop.

Arkansas recognizes that a member of a train crew keeping a lookout has the right to assume that an approaching motorist will stop instead of place himself in a position of peril in the path of a moving train. *See, e. g., St. Louis Southwestern Ry. v. Evans,* 254 Ark. 762, 497 S.W.2d

692 (1973); *Sherman v. Missouri Pacific R. R.,* 238 Ark. 554, 383 S.W.2d 881 (1964); *Missouri Pacific R. R. v. Doyle,* 203 Ark. 1111, 160 S.W.2d 856 (1942). Where a motorist has stopped or slowed his vehicle and has then proceeded into the path of an approaching train, Arkansas has recognized that the train crew's failure to keep a proper lookout is not an issue. *See St. Louis Southwestern Ry. v. Evans, supra; Missouri Pacific R. R. v. Ellison,* 250 Ark. 160, 465 S.W.2d 85, 93 (1971) (concurring opinion) and cases cited.

However, the lookout instruction has been approved where the crew's testimony concerning the location of the motorist when he was first seen conflicts with the crew's prior statements or depositions. *See St. Louis Southwestern Ry. v. Taylor, supra.* The Arkansas court has also approved the instruction where the train was in a back-up movement and where the crew, seated in the front of the engine some thirty feet from the rear, had an obstructed view of approaching motorists. *Missouri Pacific R. R. v. Harelson,* 238 Ark. 452, 382 S.W.2d 900 (1964).

Two witnesses, Hammonds and Steward, testified that the decedent failed to slow or stop his truck as he approached the crossing and that his speed did not vary before impact. Evidence indicated that decedent likewise failed to stop or slow his vehicle before he crossed a Missouri Pacific track, which was approximately 135 feet west of and parallel to defendant's track and which was similarly marked with a crossbuck.

The trial testimony of Hammonds with regard to the incident was not completely satisfactory. He testified that when he first saw the truck, he did not think much of it. He contradicted his deposition and his statement to the railroad's claim agent as to where the truck and train were when he first saw the truck and he was not very specific as to where the truck was when he yelled "big hole," although he finally agreed that the truck had passed the Missouri Pacific track.

---

3. Evidence showed that defendant's own rules imposed a speed limit of 20 miles per hour.

On direct examination Hammonds testified that he had a clear and unobstructed view west and south, but on cross examination he indicated that a building obstructed his view to prevent his seeing the truck before he did, and evidence showed that the Sherman Concrete building might have obstructed his view. The train was in a back-up movement, and we assume that Hammonds, like the engineer, was about forty feet from the back of the engine.

Viewing the evidence in the light most favorable to the plaintiff, we believe that a jury could infer that a proper, efficient lookout was not being kept immediately prior to the collision and that failure to keep such a lookout was a proximate cause of the collision. We hold that the giving of the lookout instruction was not error.

The third instruction assigned as error, AMI No. 1801, reads as follows:

There was in force in the State of Arkansas at the time of the occurrence a statute which provided: A railroad is required to place on each locomotive a bell or whistle, and these shall be rung or whistled at a distance of at least a quarter mile from where the tracks cross any public street and shall be kept ringing or whistling until the locomotive has crossed the street.

A violation of this statute, although not necessarily negligence, is evidence of negligence to be considered by you along with all of the other facts and circumstances in the case.

Defendant says that of the three witnesses who testified concerning the whistle and bell, none said that the whistle and bell were not sounded, and to submit the issue to the jury was therefore error. Furthermore, defendant contends that the presence and approach of the train were so obvious to the decedent that an instruction on signals should not have been given.

For its argument that there was insufficient evidence to go to the jury on whether the whistle or bell were sounded, defendant relies on the holding in *Haney v. Missouri Pacific R. R.*, 214 Ark. 673, 217 S.W.2d 610 (1949), wherein a directed verdict for the railroad was upheld. In that case some witnesses testified that the train crew gave the signals, while others stated that they heard no whistle or bell but were unwilling to swear that neither of these signals was given. Despite this holding, there is more recent Arkansas authority permitting this issue to go to the jury under similar facts. *Chicago, Rock Island & Pacific R. R. v. Sparks*, 220 Ark. 412, 248 S.W.2d 371 (1952).[4]

■ Defendant is correct in its contention that there is Arkansas authority to the effect that the whistle and bell instruction should not be given where circumstances indicate that giving these signals was not a relevant factor because the injured party had "knowledge otherwise" of the approach of the train. *Missouri Pacific R. R. v. Doyle, supra; Kansas City Southern Ry. v. Baker*, 233 Ark. 610, 346 S.W.2d 215 (1961).[5] Signals cease to be relevant "when the presence or approach of the train was known to the injured party by means other than the signals or was so obvious that he cannot be heard to say that he was unaware of it." *St. Louis Southwestern Ry. v. Taylor, supra*, 258 Ark. at 454, 525 S.W.2d at 454.

But the Arkansas standard for determining when signals cease to be relevant is a strict one. That the train might have been discovered by the injured party's exercise of ordinary care does not remove from jury consideration the duty of the crew to give the signal. *See St. Louis Southwestern Ry. v. Taylor, supra; Missouri Pacific R. R. v. Ellison, supra; Scoville v. Missouri Pacific R. R.*, 458 F.2d 639 (8th Cir. 1972).

4. In *St. Louis Southwestern Ry. v. Taylor, supra*, this issue went to the jury under similar facts but the instruction was attacked on appeal for reasons other than the sufficiency of evidence.

5. The Arkansas Supreme Court has noted that its numerous cases on this point seem inconsistent. *See St. Louis Southwestern Ry. v. Taylor, supra*, 258 Ark. at 454, 525 S.W.2d 450, and cases cited.

■ Three witnesses testified concerning the sounding of the whistle or bell. The engineer, Ridenour, testified that he blew the whistle from the time the train passed the whistle board, which is one quarter mile north of the crossing, and that he also rang the bell. This testimony was inconsistent with what Ridenour indicated in his statement of April 19 to the defendant's claim agent, as then he said that he had sounded the whistle from about fifteen car lengths north of the crossing. This distance is approximately 750 feet and is substantially less than one quarter mile.

The second witness who testified concerning the signals was Don Pittman, who said that he was in front of his business at Sixth and Spradling, about 1200 or 1500 feet from defendant's track, when he heard the collision. Pittman testified that prior to the impact he did not hear a whistle or bell, even though he had heard whistles from his location on previous occasions. He stated that there were no other noises which would have prevented his hearing these signals on the night of the incident had they been given.

The third witness, William Steward, testified that as he was proceeding east on Spradling Avenue behind the decedent's truck he heard the train's whistle when he was even with the gate of the Sherman Concrete plant. He did not remember hearing a bell. According to defendant's expert evidence this gate is 370 feet west of defendant's track. Steward testified that he did not hear the whistle before he reached that point, that his car window was down, and that there was nothing which would have prevented his hearing the whistle at an earlier point had it been blown.

We believe that the foregoing evidence presented a question for the jury whether the train crew sounded the train's whistle or bell as required by law.

We find little merit to defendant's contention that this issue should not have gone to the jury because the presence of the approaching train was obvious to the decedent. Evidence showed that from the decedent's point of view, the lights of defendant's train north of the crossing may have been difficult to distinguish from other lights in the background, specifically those on Midland Boulevard. The Sherman plant may have obstructed decedent's view of the train to about the same extent as it may have obstructed the fireman's view of the truck. The crossbuck did not warn a motorist of an approaching train but only of the existence of a railroad track. From these facts we cannot say as a matter of law that the presence of the train was obvious to the decedent.

■ The last instruction assigned as error is the "abnormally dangerous crossing" instruction, AMI No. 1805, which the court delivered as follows:

Helen Marie Shibley, administratrix of the estate of George Shibley, deceased, contends that the railroad grade crossing in this case was abnormally dangerous, and she has the burden of proving this proposition.

If a railroad grade crossing is frequently used by the travelling public, if trains pass over it frequently, and if the crossing is so dangerous because of surrounding circumstances that a reasonably careful person could not use it with reasonable safety in the absence of special warnings, then it would be an abnormally dangerous crossing. Whether the railroad grade crossing in this case was abnormally dangerous is for you to decide.

If you find that the crossing was abnormally dangerous, as I have defined that term, then it was the duty of the railroad to use ordinary care to give a warning reasonably sufficient to permit the travelling public to use the crossing with reasonable safety.

Defendant contends that the evidence failed to show two elements essential to establishing a crossing as abnormally dangerous: frequent use of the crossing by trains and surrounding circumstances which render the crossing unsafe in the absence of special warnings.

Defendant points out that the Arkansas court has held that three trains per day did

not constitute, as a matter of law, "frequent" use for purposes of AMI 1805. *Chicago, Rock Island & Pacific R.R. v. Gray*, 248 Ark. 640, 453 S.W.2d 54 (1970). Defendant observes that to date there are only four decisions interpreting Arkansas law in which this instruction has been approved and that all are readily distinguishable from the instant case. *Scoville v. Missouri Pacific R.R., supra; St. Louis Southwestern Ry. v. Farrell*, 242 Ark. 757, 416 S.W.2d 334 (1967); *St. Louis Southwestern Ry. v. Jackson, supra; Hawkins v. Missouri Pacific R.R.*, 217 Ark. 42, 228 S.W.2d 642 (1950).

It seems to us that in considering the Arkansas decisions concerning abnormally dangerous crossings the entire scope of facts and circumstances surrounding each case must be viewed, and that undue consideration should not be given to any particular element. For example, in *Gray* the court held that three trains per day was not "frequent" use, but noted that vehicular traffic at the crossing was apparently light and that there were no other circumstances which might establish the railroad's negligence in failing to provide special warnings at the crossing.

In *Hawkins*, in reversing a directed verdict for the railroad, the court did not even mention the number of trains that used the crossing but held that there was a jury question as to whether the railroad was negligent in failing to station a flagman at a slightly raised crossing that was inside the city limits and was frequently used by automobiles. There the accident occurred when a motorist ran into a train stopped over the crossing at 2:00 a. m. Evidence showed that bright lights from a car on the other side of the tracks were shining under the train and through the open doors of empty boxcars and made the crossing appear unobstructed to the plaintiffs.

The decisions in *Jackson* and *Farrell* concerned separate accidents at the same crossing. Vehicular traffic at the crossing exceeded well over one thousand cars per day, and train traffic averaged 16.4 trains per day. In each case the motorist's vision had been impaired by sunlight and his vehicle had struck the second or third diesel engine of the train. In both cases the motorist's view of southbound trains was shown to be obstructed, and the signal at the crossing was flashing lights. In *Farrell* the court rejected the railroad's contention that flashing lights constitute "special warnings" for purposes of AMI No. 1805.

In *Scoville* this court, interpreting Arkansas cases, approved the abnormally dangerous crossing instruction where evidence showed that on one particular day there were 17 trains and 1395 vehicles using the crossing. However, the opinion seems to place more emphasis upon the evidence that a motorist's view was obstructed by sunlight and by underbrush and foliage.

In the instant case evidence showed that six trains use the crossing per day. A traffic count taken on April 17–18 indicated that 2211 vehicles used Spradling Avenue at a point some 300 yards from the crossing; another count on May 29–30 showed that 2293 vehicles crossed defendant's track on Spradling. Testimony also indicated that a motorist driving in an eastward direction on Spradling Avenue did not have an unobstructed view of defendant's track to the north until he was within 187 feet of the track. As noted above, evidence showed that a train engine's lights might be difficult to distinguish from lights on Midland Boulevard, a busy street east of defendant's tracks. In view of these facts, and facts considered by the Arkansas court in decisions approving the instruction, we are unwilling to hold that the trial judge was in error when he delivered AMI No. 1805.

■ Finally defendant urges that the trial court should have granted its motion for a directed verdict on grounds that there is no substantial evidence of defendant's negligence and that as a matter of law the negligence of the decedent was greater than any negligence on the part of defendant. In the light of what has already been said, it is unnecessary for us to discuss whether there was substantial evidence of defendant's negligence. We note that there was substantial evidence of negligence on the part of the decedent and that

the jury was properly instructed that it could find the decedent negligent and that the plaintiff's recovery would be barred if the negligence of the decedent was found to be greater than or equal to that of the defendant. But we are not persuaded that as a matter of law defendant was entitled to a directed verdict.

Finding no reversible error, we affirm.